UNITED STATES of America, Appellee,

v.

Charles E. NEISWENDER, a/k/a Lee Anderson, Appellant.

No. 77–1642.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 9, 1977.

Decided. Jan. 9, 1979.

J. Frederick Motz, Baltimore, Md. (Charles M. Kerr, Baltimore, Md., on brief), for appellant.

Barnet D. Skolnik, Asst. U. S. Atty., Baltimore, Md. (Jervis S. Finney, U. S. Atty. and Ronald S. Liebman, Asst. U. S. Atty., Baltimore, Md., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, BRYAN, Senior Circuit Judge, and RUSSELL, Circuit Judge.

HAYNSWORTH, Chief Judge:

The appellant in this action seeks reversal of his conviction for obstruction of justice. Although the case raises serious issues, we find no reversible error and affirm.

## I.

Shortly after commencement of the criminal trial of former Maryland Governor Marvin Mandel, Charles E. Neiswender, the defendant-appellant, contacted Arnold Weiner, Mandel's chief defense attorney. Neiswender told Weiner he could "guarantee" an acquittal of Mandel if "proper financial arrangements were made." Weiner promptly informed the United States Attorney and District Judge Pratt, then presiding over the Mandel trial, of this unusual development. Desirous of apprehending Neiswender, identifying a corrupted juror, if one existed, and averting prejudicial publicity likely to lead to a mistrial in the complex Mandel prosecution, government agents cautiously undertook investigation of the Neiswender matter.

In further communications to Weiner and a postal inspector posing as Weiner's associate, Neiswender claimed that he represented a Baltimore man who had been contacted by a juror sitting on the Mandel case. For $20,000, Neiswender asserted, he could ensure that the trial "would come out the right way." Undercover investigators led Neiswender on, hoping he would identify his compatriots. After Neiswender repeatedly refused to disclose the name of his principal or the corrupted juror, government agents broke off contact in an attempt to provoke a disclosure. Neiswender, however, failed to resume communications for four weeks, and the investigators decided to arrest him. Sensitive to the explosive publicity that might attend an initial appearance before another court, the postal investigators approached Judge Pratt. The judge issued a warrant for Neiswender's arrest and, at the agents' request, agreed to make himself available in Baltimore for Neiswender's initial appearance.

On the morning of November 5, postal inspectors arrested Neiswender as he left his southern New Jersey home. He was shown the arrest warrant and a list of his constitutional rights. He was then driven to Baltimore, a distance by highway of about 107 miles. Within a few hours of arrival, Neiswender appeared before Judge Pratt. The initial appearance apparently was conducted in secret, and no record of the proceedings was made. It is clear, however, that Neiswender waived his right to counsel.

Apparently to foreclose the possibility of release, Judge Pratt set bail at $1,000,000. The police then took Neiswender into custody and interrogated him. That evening Neiswender called his wife, who came to Baltimore five days later and convinced Neiswender to obtain court-appointed counsel. On November 15, the government released Neiswender to avoid the publicity likely to accompany a preliminary examination. See F.R.Cr.P. 5(c) (requiring preliminary hearing within ten days of arrest if defendant is in custody). Prior to his release, Neiswender made incriminating statements.

After unrelated events resulted in the declaration of a mistrial in the *Mandel* case, Neiswender was indicted. The indictment charged that Neiswender "did corruptly endeavor to influence, obstruct, and impede the due administration of justice with respect to the then on-going trial in the federal criminal case of *United States v. Mandel, et al.* in that "[he] did solicit from an attorney in that case, and from another individual whom [he] then believed to be associated with that attorney, a certain sum of money to ensure that a juror would vote to acquit one or more of the defendants in that case."

Neiswender was convicted on essentially the evidence outlined above. There was no proof that he ever dealt with a juror or anyone who had contact with a juror. He now asserts three bases for reversal: (1) the misconduct of the police and trial judge in the post-arrest treatment of Neiswender; (2) a failure of the prosecution to prove the type of intent necessary for conviction cou-

pled with faulty jury instructions essentially adopting the prosecution's theory of the case, and (3) a variance between the crime charged and the proof upon which the defendant was convicted.

## II.

The defendant's first assignment of error need not long detain us. The defendant asserts that the handling of his case by the police, prosecutors, and trial judge was so egregious as to mandate the exercise of this court's supervisory powers by ordering dismissal of the indictment. Neiswender's principal complaints are:

(1) The arrest warrant violated F.R.Cr.P. 4(c)(4) because it did not direct the arresting officers to bring the defendant before the nearest available magistrate;

(2) Postal authorities were not authorized to obtain a warrant charging obstruction of justice, a non-postal offense (*see* 18 U.S.C.A. § 3061);

(3) The officers, following the arrest, moved Neiswender more than one hundred miles in violation of F.R.Cr.P. 40;

(4) The secretive nature of the initial appearance conducted by Judge Pratt contravened the spirit of F.R.Cr.P. 5 and the ABA Standards Relating to the Administration of Criminal Justice;

(5) Bail was excessive and imposed for a purpose not permitted by the federal bail provisions (*see* 18 U.S.C. § 3146); and

(6) The failure to obtain an indictment within thirty days of the initial arrest violated the Maryland District Court's local rule promulgated to comply with the Speedy Trial Act.

■ We need not carefully scrutinize these assertions of misconduct. Assuming the officers violated Neiswender's rights, such violations were essentially technical and nonprejudicial to his defense and resulted from judicially authorized and supervised police conduct undertaken to advance the understandable goal of avoiding a mistrial in the *Mandel* case. Under these circumstances, we refuse to invoke our supervisory powers to dismiss the indictment.

While severe official misconduct born of malice, caprice or brazen lawlessness might justify supervisory intervention, the facts presented here simply fail to warrant such extreme action. *See generally* Note, Supervisory Power in the United States Courts of Appeals, 63 Cornell L. Rev. 642, 649–50, 659–65 (1978).

While we do not condone the abrogation of one man's rights to avoid unfairness to another, we refuse to adopt the defendant's proposed remedy for the government's purported wrongs. Assuming Neiswender's arrest and detention were illegal, the suppression of illegally obtained evidence provided a proper sanction. Indeed, the government did not use inculpatory statements made by Neiswender during his detention in Baltimore.

The defendant cites us to no case ordering a supervisory dismissal on facts similar to those presented here. He relies principally on *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974). But that case involved the government kidnapping of a defendant in Uruguay in violation of several international treaties.

### III.

 The defendant also contends that the government failed to prove all the elements of the alleged crime. The federal obstruction of justice statute, 18 U.S.C. § 1503, provides in relevant part:

"Whoever . . . endeavors to influence, obstruct, or impede the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years or both."[1]

Neiswender argues that the statute does not proscribe mere fraud, that it punishes instead illicit designs to undermine judicial processes, and that it therefore requires a specific intent to obstruct justice. Neiswender contends the government proved nothing more than an ill-advised attempt to obtain money by deception.

The government concedes that the defendant's primary intent was one to defraud. It urges, however, that every man intends the natural consequences of his acts. Had Neiswender convinced Weiner that he had a juror under his control and induced Weiner to participate in the scheme, the natural consequence would have been to reduce Weiner's efforts in defending his client. This debilitating effect on defense counsel would have altered the normal course of trial and prejudiced the client. This "natural consequence," the government contends, would have obstructed the due administration of justice.

Neiswender has a rejoinder to this argument. In his view, while operation of the time-honored "natural consequences" rule might normally suffice to establish specific intent, it should play no role in this case. Neiswender contends that whatever force a presumed intention has must give way to actual intent. Here Neiswender's motiva-

---

1. The full statute provides:

Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States magistrate or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate or other committing magistrate, in the discharge of his duty, or injures any party or witness in his person or property on account of his attending or having attended such court or examination before such officer, magistrate, or other committing magistrate, or on account of his testifying or having testified to any matter pending therein, or injures any such grand or petit juror in his person or property on account of his being or having been such juror, or injures any such officer, magistrate, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct or impede the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both. 18 U.S.C. § 1503.

The failure to indict under the first clause of this section is unexplained. But since the first and final clauses overlap, the failure is not necessarily fatal to this prosecution. *See United States v. Partin*, 552 F.2d 621, 631 (5th Cir. 1977).

tion was directly at odds with any design to obstruct justice since a guilty verdict would have revealed Neiswender's fraud. It was in his best interest for Weiner to press hard in his efforts to obtain an acquittal. Indeed, the evidence suggests that Neiswender recognized this fact for, during negotiations with Weiner's "associate," he insisted that defense counsel were "not to slouch in their duties" and "were to give it the full effect."

The state-of-mind requirement of § 1503 has long confused the courts. Some cases require only that the defendant "intend to do some act which would tend to corruptly impede or influence the administration of justice." *Ethridge v. United States*, 258 F.2d 234, 235 (9th Cir. 1958); *see Knight v. United States*, 310 F.2d 305 (5th Cir. 1962) ("specific intent must be to do some act or acts which tend to impede . . . the due administration of justice.")

Other cases, however, have imposed the ostensibly more demanding requirement of "a specific intent to obstruct justice." *United States v. Carleo*, 576 F.2d 846, 849 (10th Cir. 1978); *see United States v. Harris*, 558 F.2d 366, 369 (7th Cir. 1977) (requiring that charged conduct "was intended to impede witness"); *United States v. Ryan*, 455 F.2d 728, 734 (9th Cir. 1972) ("specific intent to impede the administration of justice").

■ None of these cases, however, has carefully considered how the specific intent requirement applies to a defendant whose hope is to avoid obstructing justice while the natural consequence of success in his endeavor would be to achieve precisely the opposite result. We see no need to undertake an extended excursion into the subtleties of specific intent. In our view, the defendant need only have had knowledge or notice that success in his fraud would have likely resulted in an obstruction of justice. Notice is provided by the reasonable foreseeability of the natural and probable consequences of one's acts.

We find support for our conclusion in the purpose of the statute and in the case universally read as imposing the specific intent requirement. *Pettibone v. United States*, 148 U.S. 197, 13 S.Ct. 542, 37 .L.Ed. 419 (1893). *Pettibone* involved a prosecution under the almost identically worded forebear, Rev.Stat. § 5399, of the present obstruction of justice statute. The defendants were charged with attempts to intimidate mine operators into discharging employees and to coerce employees into quitting their jobs. The effect of this misbehavior was to interfere with an existing federal court injunction. The alleged conspirators defended on the ground that the indictment did not charge knowledge that the injunction existed or a purpose to obstruct justice.

The court agreed with the defendants that the indictment was deficient:

> The obstruction of the due administration of justice in any court of the United States, corruptly or by threats or force, is indeed made criminal, but such obstruction can only arise when justice is being administered. Unless that fact exists, the statutory offense cannot be committed; and while, *with knowledge or notice of that fact, the intent to offend accompanies obstructive action*, without such knowledge or notice the evil intent is lacking. *It is enough if the thing is done which the statute forbids*, provided the situation invokes the protection of the law, *and the accused is chargeable with knowledge or notice of the situation*, but not otherwise.

Id. at 207, 13 S.Ct. at 546. (Emphasis Added).

■ We fully recognize that in speaking of "knowledge or notice" the Court was referring to the attendant circumstance of justice being administered. We see, however, no reason not to apply the same "knowledge or notice" standard to the result of obstructing justice. The likely result and attendant circumstances define the context in which the defendant intentionally acts. We perceive no reason to apply different culpability standards to these surrounding aspects of the criminal event. Indeed, since the policy of the statute is to prevent interference with the evenhanded

and orderly administration of justice, our reading of the statute is only logical. The defendant's design is irrelevant; if the natural result of his plan is to interfere with judicial processes, justice will be obstructed whether he hopes it is or not. Requiring notice of this proscribed result focuses the constraints of the law on those sought to be deterred while ensuring that only the culpable are punished. Thus when a defendant intentionally seeks to corrupt, the foreseeable consequence of which is to obstruct justice, he has violated § 1503.[2]

We embrace the "knowledge or notice" standard because it shifts analysis away from the age-old fiction of "presumed intent." But even were we to conclude that knowledge and notice have no place in this decision, we would reach the same result. *Pettibone* itself acknowledges the propriety of inferring specific intent where the disfavored result naturally flows from a wrongful undertaking:

> Specific intent to violate the statute must exist. to justify a conviction . .. It is true that if the act in question is a natural and probable consequence of an intended wrongful act, then the unintended wrong may derive its character from the wrong that was intended. . .

*Id. See also United States v. Jackson,* 168 U.S.App.D.C. 198, 202, 513 F.2d 456, 460 (1975) ("normally, the natural probable consequences of an act may satisfactorily evidence the state of mind accompanying it . . . . We perceive nothing that would divert cases of the instant type from this branch of legal doctrine"). *Accord United States v. Harris,* 558 F.2d 366, 369 (7th Cir. 1977).

In our view, Neiswender's protestations that his actual desires directly contradicted his presumed intent cannot avail to avoid operation of this principle. The Court in

*Pettibone* itself terms the "natural consequences" rule a fiction that facilitates punishment of acts of "artificial character." *See also Duke v. United States,* 90 F.2d 840, 841–42 (4th Cir. 1937) ("one who knowingly sends a letter to a grand jury which shows on its face the intention that it shall be considered with respect to a pending case, cannot be heard to say that he did not attempt to influence the grand jury thereby"). Of course, this fiction is grounded upon sound policy, for, as outlined above, a rule focusing on foreseeable, rather than intended, consequences operates in sensible and fair fashion to deter the conduct sought to be avoided and to punish those whose actions are blameworthy, even though undertaken for purposes that may or may not be culpable.

◼ The alternative routes we follow here lead to precisely the same destination. Results that are "natural and probable" are by definition "reasonably foreseeable," and what is foreseeable by definition suffices to supply notice. Thus we hold that a defendant who intentionally undertakes an act or attempts to effectuate an arrangement, the reasonably foreseeable consequence of which is to obstruct justice, violates § 1503 even if his hope is that the judicial machinery will not be seriously impaired.

◼ Since the court instructed the jury that it had to find an intent to obstruct justice, and pointed out that "[i]t is ordinarily reasonable to infer that a person intends the natural and probable consequences of acts knowingly done or undertaken," the jury instructions do not contain reversible error. Indeed, by requiring a finding that Weiner could reasonably have believed Neiswender's story, the defendant received the benefit of an instruction to which he was not entitled.

We are not persuaded to the contrary by *Ethridge v. United States,* 258 F.2d 234 (9th

---

2. *See also United States v. Keen,* 26 Fed.Case No. 15,511 p. 693, (Cir.Ct.Mass.1830) (Story, J.), (no defense to prosecution for obstructing performance of official duty that defendant's purpose was personal chastisement, rather than interference with officer's performance of his duty, where defendant knew officer was engaged in official task), *cited in Pettibone v. United States,* 148 U.S. at 205, 13 S.Ct. 542; *cf. United States v. Haas,* 440 F.Supp. 426, 432 (S.D.Ala.1977) (requiring "specific intent to commit the act and a knowledge of the circumstances that make the act a violation of the statute").

Cir. 1958). Ethridge was indicted under § 1503 for promising Walters, who had been convicted of an offense, that in exchange for $1,000 Ethridge could assure that Walters would receive probation and not a term of imprisonment. The government's theory was that acceptance of the proposal would have led Walters to abandon any attempt to appeal. The Ninth Circuit rejected the government's contention on the ground that the only natural consequence of the offer was Walters immediate conclusion that it was a simple attempt to defraud him. The case is entirely unlike this one in which the jury has found that a reasonable person in Mr. Weiner's position would have considered Neiswender's proposal a serious proposal and not a simple attempt to defraud. We do not suggest agreement with *Ethridge*, however. Abandonment of an appeal may not have been a natural consequence of the proposal, but the fact that Walters believed it to be a transparent attempt to defraud is irrelevant. Attention should focus upon Ethridge's endeavor, and consideration of its natural consequence should be upon an assumption of success. The statute speaks specifically to an endeavor, and the statute is violated whether or not success of the endeavor would require a high degree of gullibility in the target victim so long as the endeavor itself was done seriously and with the hope of success. Nor is it of consequence here that Neiswender's endeavor did not flower into success. *See United States v. Russell*, 255 U.S. 138, 143, 41 S.Ct. 260, 65 L.Ed. 553.

### IV.

■ The defendant finally contends that the charge contained in the indictment was at variance with the crime proved at trial. The indictment alleged that Neiswender "solicit[ed] from an attorney . . . a certain sum of money to ensure that a juror would vote to acquit." On its face, the indictment suggests that the crux of the case is jury-tampering, while in fact the

government's case had nothing to do with jury-tampering.

Although some ambiguity inheres in the indictment, we find it unobjectionable. The government contends, and we agree, that the solicitation alone constituted a proscribed "endeavor" given knowledge or notice that justice would be obstructed were the scheme to succeed. Thus the solicitation was the hub of the offense, and solicitation is plainly charged in the indictment. Reference to jury-tampering merely identified the nature of the solicitation and implicitly suggested the probable consequence of reduced effort by defense counsel. Accordingly, we find no variance. The indictment is not as plain as it might be, but the defendant asserts variance from, rather than "inadequacy of," the indictment. Finding no variance, we find no error.[3]

*AFFIRMED.*

---

**3.** Even if we were to hold that a variance exists, we would be constrained to hold the error harmless since no prejudice to the defendant appears. *See United States v. Quicksey*, 525 F.2d 337, 341 (4th Cir. 1975). See also F.R.

Cr.P. 52(b). *But cf. United States v. Somers*, 496 F.2d 723, 744 (3d Cir. 1974) (variance constitutes reversible error *per se* where it alters elements of the crime charged).