UNITED STATES of America, Appellee,

v.

Anthony J. BUFFALANO,
Defendant-Appellant.

No. 381, Docket 83–1254.

United States Court of Appeals,
Second Circuit.

Argued Nov. 4, 1983.

Decided Feb. 1, 1984.

Mark F. Pomerantz, New York City (Ronald P. Fischetti, Anne C. Feigus, New York City, of counsel), for defendant-appellant.

Joseph E. Gangloff, Atty., Public Integrity Section, Crim. Div., Dept. of Justice, Washington, D.C. (Raymond Dearie, U.S. Atty., E.D.N.Y., Brooklyn, N.Y., of counsel), for appellee.

Before MESKILL, NEWMAN and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

Appellant, Anthony J. Buffalano, is a lawyer convicted under a single count indictment charging him with extracting $3,500 from another individual who was about to be sentenced. Buffalano represented that the money solicited would be used to bribe the judge and ensure that the individual receive a lenient sentence. Following a three day jury trial before the United States District Court for the Eastern District of New York (Bartels, *J.*), appellant was convicted under 18 U.S.C. § 1503 (1982), the federal obstruction of justice statute. The attorney's actions in this case demonstrate a woeful lack of understanding of a lawyer's special responsibility as an officer of the legal system for the quality of justice and the requirement that he demonstrate respect for that legal system and those, including judges and other lawyers, who serve it.

■ This appeal presents a two-fold issue: whether Buffalano's actions violate 18 U.S.C. § 1503, and, if so, whether the law was properly charged to the jury. Because the evidence permitted the jury to find a violation of the statute, we reject appellant's request that the indictment be dismissed; nonetheless, since the charge was incorrect the conviction must be reversed and the case remanded to the district court for a new trial.

## I. *BACKGROUND*

Buffalano's background as an attorney included service as an Assistant District Attorney in Brooklyn, counsel to the Police Benevolent Association and, at the time that this January 1983 indictment was filed, law secretary for a Justice of the New York State Supreme Court. The indictment charged that Buffalano did "corruptly endeavor to influence, obstruct and impede the due administration of justice with respect to the then pending sentence of . . . Thomas Conti. . . . in that Anthony J. Buffalano did solicit from . . . Conti . . . a sum of money representing that Anthony J. Buffalano would ensure through corrupt

means that Conti would receive a lenient sentence."

The facts as developed at the April 1983 trial are not in dispute. Six witnesses testified. The principal witness was Gaetano "Tommy" Conti whose recorded conversations with appellant Buffalano contained the incriminating evidence which convicted appellant of obstruction of justice. Two of the witnesses, Hanley and Ryan, are FBI agents. Visokay is Conti's federal probation officer, Agulnick was Conti's attorney and Judge Platt was scheduled to be the sentencing judge in Conti's criminal case. When he learned of the payoff scheme, Judge Platt recused himself.

Conti is a printer by trade whose friendship with Buffalano is one of many years standing. Conti was arrested in the summer of 1981 for counterfeiting. After his arrest he sought out his old friend Buffalano for advice. Buffalano was unable to represent him because he was serving as a law secretary to a New York state court judge. He did arrange to have Conti see attorney Barry Agulnick, with whom Buffalano had previously been associated in a law practice. After a meeting between the two, Conti retained Agulnick. Buffalano continued to act as a liaison between Conti and Agulnick, relaying information back and forth. In September 1981 Conti pled guilty to conspiracy before Judge Platt. About two days before his scheduled sentencing, Conti had a conversation with Buffalano. On that occasion Buffalano told Conti that Agulnick had read his pre-sentence report and that "it didn't look too good." At the same time Buffalano, to whom Conti owed some money, mentioned that for the sum of $3,500 he could arrange to "fix" the sentencing judge to ensure a lenient sentence. Conti understood this to be a reference to Judge Platt. Buffalano described how he would go about it. His method was to contact another lawyer who was a leader of the 52nd District Democratic Club and if money was forthcoming, that person could "fix" the case. To lend credence to his claimed ability to influence the sentencing, Buffalano related how this same political leader had handled another

case before another United States District Judge. In that case a woman by the name of Valerie was supposed to receive a three-year sentence, but instead received only six months. Buffalano knew that Conti was aware that a former law associate of Agulnick had represented Valerie. Buffalano's story was a trumped-up tale, cut from whole cloth.

While pondering this proposition and without indicating whether or not he would pursue it, Conti told Buffalano that he had some information on a drug related case and asked him to contact Agulnick and relay that fact as well as the fact that Conti planned to cooperate with the Government in the counterfeiting case charged against him. The cooperation consisted of Conti "setting-up" a criminal suspect in a drug related case and then contacting government agents who, in return, would make that cooperation known to the court at the time of Conti's sentence. While talking with one of the agents about this drug-related matter, Conti mentioned the conversation that Buffalano had had with him about paying off a federal judge to obtain a lenient sentence.

Unknown to Buffalano, Conti then decided to cooperate with the government in an investigation of Buffalano's solicitation of money ostensibly to "fix" the sentence by bribing a federal judge. Conti was put in contact with FBI agents Hanley and Kirby who instructed him to arrange a meeting with Buffalano and to attend it wearing a body recorder. Conti was to tell Buffalano that he had been unable to arrange the "set-up" in the drug-related case and that since "cooperation" was not going to help him, he now wanted Buffalano to talk to the local political leader on his behalf. The specific meeting where this ploy was to be used was set by a telephone call for December 4th. On December 4, 1981 Conti and Buffalano met for lunch. Conti falsely explained that the case he was cooperating in was not going well and that he was nervous about his sentencing. Buffalano agreed that cooperation would not help and that Agulnick had told him the prosecutor wanted to put Conti away for five years. The

pre-sentence report had actually recommended only six months. Another meeting to discuss the matter further was arranged for December 10. Prior to that date the government agents not only wired Conti with a body recorder, but also gave him $3,500 in cash. On this occasion Conti and Buffalano met in front of the Supreme Court building on Court Street in Brooklyn and then drove around together in an automobile. The recording of the conversation, though inaudible in spots, clearly reveals Buffalano assuring Conti that the "fix" was in. Ironically, at one point in the conversation, when Conti asked a pointed question using the word "fix," Buffalano sharply rejoined "what kind of _____ talk is that? . . . . when you use words like that . . . I figure there's a tape recorder." Failing to heed his own suspicious instincts, Buffalano accepted the $3,500 cash payoff and, undaunted, later continued to give assurances to Conti falsely relating how the money had been used to ensure his obtaining a lenient sentence. Actually, Buffalano had simply put the money in his pocket. He made no attempt to contact Judge Platt, nor was there any evidence that such contact was ever contemplated.

The other witnesses, attorney Agulnick, probation officer Visokay, and Judge Platt, testified regarding the role of a defendant in the sentencing process who has pleaded guilty to a charge. A defendant may, for example, contact the prosecuting attorney and volunteer information in an effort to secure a favorable recommendation at sentence. The defense attorney must be given information relating to defendant's character, family life, employment record and the like to submit by way of mitigation prior to and at sentencing. The defendant also has an opportunity to speak to his probation officer and, with his attorney, to dispute the report and to address the court. The defendant's cooperation, if any, with the government is reflected in the probation report which the judge considers prior to sentencing and a judge may also be influenced by what he hears during the defendant's allocution at sentencing. The conclu-

sion drawn from this testimony is that a defendant who foregoes this active role of self-help risks prejudicing his own case before the sentencing court. It is in the light of this factual background that we discuss the legal issues raised.

## II. *DISCUSSION*

### A. *"Endeavor" Under § 1503*

The first issue is whether appellant's actions constitute a violation of 18 U.S.C. § 1503. That statute provides:

"Whoever * * * corruptly * * * endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both."

Buffalano argued in a motion to dismiss the indictment and at the trial prior to the submission of the case to the jury, that while his bogus "fix" scheme defrauded Conti, he never endeavored or intended to impede the administration of justice. Therefore, his argument concludes, he did not commit a violation of § 1503. We do not accept such a narrow reading of the statute.

The indictment charged that Buffalano did corruptly endeavor to influence, obstruct and impede justice. The operative word is "endeavor." The question then is whether defendant's action amounted to an endeavor within the meaning of the statute. In *United States v. Russell,* 255 U.S. 138, 143, 41 S.Ct. 260, 261, 65 L.Ed. 553 (1921), the Supreme Court defined "endeavor," while discussing the statute's predecessor, as "any effort or essay to accomplish the evil purpose that the section was enacted to prevent." By using such term Congress purged from the statute the technicalities associated with distinguishing between preparation for an attempt and the attempt itself. *See id.* at 143, 41 S.Ct. at 261. The conclusion is that an "endeavor" under § 1503 does not require proof that would support a charge of attempt, i.e., an "endeavor" is less than an attempt.

Appellant relies on *Ethridge v. United States,* 258 F.2d 234 (9th Cir.1958) for his argument that his actions did not constitute an endeavor. In that case the defendant promised another person awaiting sentencing that for $1,000 he could ensure probation. The "offer" was not accepted. Nonetheless, defendant was convicted under § 1503. On appeal, the Ninth Circuit reversed after looking to an earlier decision involving a similar statute where the court had held that an endeavor required an act directed at some person "who had legal authority to do, or not to do some act which would or could affect the final outcome" of the case. *Id.* at 236 n. 2.

To support its contention that Buffalano's actions constituted an endeavor, the government points to *United States v. Neiswender,* 590 F.2d 1269 (4th Cir.), *cert. denied,* 441 U.S. 963, 99 S.Ct. 2410, 60 L.Ed.2d 1068 (1979). In that case the Fourth Circuit upheld a conviction where appellant, claiming that he had a juror under his control, represented to an attorney that for $20,000 he could ensure a favorable outcome for the attorney's client in a criminal case. No proof was adduced that appellant ever dealt with or had contact with any juror. Appellant argued that § 1503 did not proscribe "garden variety" frauds. Despite the government's concession that Neiswender's primary intent was to defraud, his conviction was affirmed. The *Neiswender* court held, unlike *Ethridge,* that § 1503 required only that the defendant have "knowledge or notice that success in his fraud would have likely resulted in an obstruction of justice," and that such notice was "provided by the reasonable foreseeability of the natural and probable consequences of one's acts." *Id.* at 1273. The court also stated that "the solicitation alone constituted a proscribed 'endeavor' given knowledge or notice that justice would be obstructed were the scheme to succeed. Thus the solicitation was the hub of the offense, and solicitation was plainly charged in the indictment." *Id.* at 1275.

Further, the Supreme Court in an early case held that evil intent would be lacking were defendant not shown to have knowledge or notice that his acts would obstruct

justice then actually being administered. See *Pettibone v. United States,* 148 U.S. 197, 207, 13 S.Ct. 542, 546, 37 L.Ed. 419 (1893). And our Court in *United States v. Moon,* 718 F.2d 1210 (2d Cir.1983) concluded that intent to impede the administration of justice is an essential element of a § 1503 violation, but that such intent may be inferred from defendant's knowledge of the falsity of records he submitted to a grand jury. However, in *Moon* we found that the defendant (Kamiyama) had not acted voluntarily inasmuch as he was compelled by subpoena to produce records before a grand jury investigating Reverend Moon. Hence, we held that defendant lacked the requisite intent that *his acts* would obstruct justice and consequently Kamiyama's conviction on that count was reversed. *Id.* at 1236.

■ Actual contact or even intent to contact a person having authority to affect the result need not be shown to prove a § 1503 violation. Instead, while the statutory term "corruptly endeavors" requires intent, such intent may be inferred from proof that defendant had knowledge or notice that his corrupt actions would obstruct justice then actually being administered. See *Pettibone v. United States, supra,* 148 U.S. at 207, 13 S.Ct. at 546; *Neiswender v. United States, supra,* 590 F.2d at 1275. Applying that rule to the facts in this case, we conclude that Buffalano's actions clearly could constitute a violation of § 1503. His solicitation was an endeavor under the statute that had the potential to lull an "innocent victim" into a false sense of security, deterring him from taking an active role himself to secure a more favorable sentence. For example, as a result of being fraudulently lulled into a false sense of security a victim might fail to volunteer information to the prosecutor, supply his own counsel or his probation officer with mitigating material drawn from his own life, dispute the pre-sentence report or address the court upon allocution. Having decided that Buffalano's activities firmly subjected him to prosecution under § 1503, we turn to the trial court's charge to the jury on the law which they were to apply.

### B. Charge to the Jury Under § 1503

■ The problem with the charge in this case is not that it omitted a legal theory required to be included but, rather, that it included several theories. The decision to use additional language embracing several legal theories made the charge confusing—not clearer—for the jury. The trial court fell victim to an understandable desire to satisfy the differing contentions of the parties regarding the standard of law applicable to the facts of this case. That the attempt was bound to fail—since the contentions were irreconcilable—is concededly easier for us to see in retrospect.

The difficulty arose because of the varying views of what was needed for the "success" of Buffalano's endeavor. Defense counsel argued then, as he does now before us, that appellant's actions could not succeed unless directed toward a person with legal authority to affect the outcome (i.e., Judge Platt). The government thought the "success" of Buffalano's endeavor to obstruct justice was proved by "lulling" Conti into neglecting to do those things to mitigate punishment that the law permits a defendant in the sentencing process. This was why the prosecutor produced witnesses as to the defendant's role in that process.

The trial court accepted the "lulling" theory advanced by the prosecutor under *Neiswender.* Unfortunately, the court did not accept the verbiage of the *Neiswender* formulation as to "success." Judge Bartels thought "success" meant ultimate payment of money to Judge Platt (or, in *Neiswender,* the ultimate payment to a juror). Hence, he said that "if that plan was successful, it's obvious . . . it would influence the administration of justice. What I'm saying, if $3,500 was given to Justice Platt, it would obviously influence. . . ." Of course, what the *Neiswender* court meant by success was not payment to the juror, but an overall reduction in the defense effort. *See* 590 F.2d at 1271. In this case, when the trial judge framed his charge, he decided to use language that he thought would cover both theories of success—appellant's view that

success meant paying money to Judge Platt and the prosecution's view that it meant lulling Conti. As he told the prosecutor, "You and I have a different concept of that ....Please read the charge. I think it covers both." And that is exactly what he did. The jury was charged on the prosecutor's theory: "[Y]ou must find beyond a reasonable doubt that he acted with the specific intent to do something the law forbids, that is to corruptly endeavor to influence, obstruct, or *impede a defendant* in a pending criminal case." (emphasis added). Then, he included the defense view: "[Y]ou must find, beyond a reasonable doubt ... that Mr. Buffalano knew or had notice that *success* in the corrupt endeavor would likely affect the due administration of justice." (emphasis added).

The jury was never told exactly what was meant by "success." Possibly the charge could be understood as referring only to the "lulling" theory, even though the trial judge thought it covered both theories. But the prosecutor himself compounded the problem by arguing in his summation a third type of "success." He urged the jury to believe that the defendant "succeeded" in interfering with justice because when the payoff plan came to light Judge Platt then had to recuse himself and ask another judge to sentence Conti. The prosecutor argued: "Ordinarily Mr. Conti would have been sentenced by Judge Platt; he wasn't. This is direct interference." He even argued that Conti's actual sentence, different from what Judge Platt had in mind, was an "effect" for which Buffalano was culpable. The prosecutor's argument simply added to the confusion.

The ultimate payment to Judge Platt was obviously not a foreseeable consequence since Buffalano knew he was never going to make that payment, nor even put in motion any action that might conceivably lead to that payment. Under the charge the jury could have convicted Buffalano if it thought, as Judge Bartels and the defense did, that "success" referred to the ultimate payment to the judge, or, if it agreed with the prosecutor, that it referred to the need to have Judge Platt recuse himself. In our

view, since the only foreseeable consequence for which Buffalano could be held criminally responsible on this record was the lulling of Conti, the charge should have confined the jury's consideration to that one theory. Because it did not, the judgment of conviction must be reversed and the case remanded for a new trial.