**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 05-4112

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

MARK ANTHONY REYNOLDS,

Defendant - Appellant.

Appeal from the United States District Court for the Southern District of West Virginia, at Beckley.   David A. Faber, Chief District Judge.  (CR-04-88)

Argued:  February 3, 2006                    Decided:  May 3, 2006

Before TRAXLER, GREGORY, and DUNCAN, Circuit Judges.

Affirmed in part; vacated and remanded in part by unpublished per curiam opinion.

**ARGUED:** James Byron Lees, Jr., HUNT & LEES, L.C., Charleston, West Virginia, for Appellant.   John Park Pearson, UNITED STATES DEPARTMENT OF JUSTICE, Public Integrity Section, Criminal Division, Washington, D.C., for Appellee.   **ON BRIEF:** Richard C. Pilger, UNITED STATES DEPARTMENT OF JUSTICE, Public Integrity Section, Criminal Division, Washington, D.C., for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

This criminal appeal arises from Mark Anthony Reynolds's wire fraud and obstruction of justice convictions, for which he was sentenced to 120 months' imprisonment. Reynolds challenges both of his convictions, principally contesting the sufficiency of the evidence to support them. With respect to his sentence, Reynolds challenges the district court's five-level upward departure. For the reasons herein, we affirm Reynolds's convictions, but vacate his sentence and remand for resentencing.

I.

The facts giving rise to Reynolds's convictions began in 2003, when a West Virginia man named Bill Buzzo was under federal investigation for money laundering. Carl R. Mapel, Jr., offered to serve as Buzzo's attorney, with Reynolds acting as Mapel's paralegal. Unbeknownst to Buzzo, Mapel could not legally represent Buzzo because Mapel's Pennsylvania bar license had been placed on inactive status in 1996 for his failure to comply with Pennsylvania's rules for continuing legal education. Reynolds, however, was aware that Mapel was no longer authorized to practice law.

Mapel and Reynolds told Buzzo and his family members that they were well connected to key Republican political figures in West Virginia. In this vein, the two falsely asserted that they could

2

obtain leniency in Buzzo's case if Buzzo provided them with funds to bribe these officials. Mapel and Reynolds charged $50,000 for their services, with an additional $50,000 in payments "for the Republicans." J.A. 220.

Mapel misrepresented his Pennsylvania bar status to the West Virginia district court and was admitted pro hac vice to represent Buzzo on the money laundering charges. Between July and October 2003, Mapel negotiated a plea agreement for Buzzo. As Buzzo's case proceeded, Reynolds grew more insistent in his requests for money, at one point seeking as much as $250,000 from Buzzo. Buzzo became increasingly uncomfortable with Reynolds's demands and threats to cut off representation such that he began conversing with Mapel and Reynolds solely from his office phone, which was located at an ambulance service where all calls were recorded. By November 2003, Reynolds and Buzzo's relationship had deteriorated to such an extent that they discontinued speaking to each other. Thereafter, Buzzo communicated solely with Mapel, and Mapel distanced himself from Reynolds in conversations with Buzzo by stating that he had not had contact with Reynolds and questioning whether Reynolds had the political connections he claimed. In fact, however, Reynolds continued to assist Mapel with Buzzo's case.

Buzzo pled guilty to his money laundering charges on December 8, 2003. In February 2004, while Buzzo awaited sentencing, the FBI learned of Mapel and Reynolds's scheme and began to investigate.

3

By then, Buzzo had paid $15,000 of the arranged bribe, with the understanding that this money had gone to the Republicans in exchange for a "good judge" and a lower sentencing range. J.A. 908, 932.

As part of its investigation, the FBI also began to record Buzzo's telephone calls. One such call occurred between Mapel in Arizona and Buzzo in West Virginia on February 18, 2004 (the "February 18, 2004 call"). During the conversation, Mapel stated that the chair of the West Virginia Republican Party would only seek home confinement for Buzzo's sentence if paid $10,000 more toward the $50,000 bribe. The FBI arranged for Buzzo's grandson, Jason Smyth, to make a controlled payment of that amount to Mapel on March 25, 2004. Investigators arrested Mapel as he left the meeting with the money.

Later that day, Smyth called Reynolds at the FBI's direction and told him that Mapel had not arrived to pick up the payment. The two arranged to meet so that Smyth could give the funds to Reynolds instead. When Reynolds picked up the money, he told Smyth that he had continued to work on Buzzo's case, having recently prepared a motion and objections, and that he planned to meet with Mapel that evening. Reynolds again emphasized his close ties with the West Virginia Republican Party Chairman and the Republican gubernatorial candidate and told Smyth that he was running for state senate. As Reynolds accepted the money, he refrained from

4

explicitly confirming what the payment was for, explaining that he had to be careful of what he said "because any irregularities for me, you know, they hit me." J.A. 872. Investigators arrested Reynolds immediately after the meeting.

When Mapel and Reynolds's scheme came to light after their arrests, the judge presiding over Buzzo's case had to "essentially start over with Mr. Buzzo's case" to avoid any taint from Buzzo's representation by an unlicensed lawyer and the promises of improper influence. J.A. 302. The judge set aside Buzzo's guilty plea and ordered the appointment of a new lawyer. This resulted in a need to renegotiate Buzzo's plea agreement, hold additional conferences and proceedings, and prepare new filings.

Mapel and Reynolds were charged with two counts of wire fraud and aiding and abetting wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, and one count of obstruction of justice and aiding and abetting obstruction of justice, in violation of 18 U.S.C. §§ 1503 and 2. Mapel pled guilty to these charges. A superceding indictment against Reynolds added a third count of wire fraud, which was subsequently dismissed prior to trial. The jury convicted Reynolds of one count of wire fraud (based upon the February 18, 2004 call) and the count of obstruction of justice, but found him not guilty of the other wire fraud charge.

At sentencing, the district court calculated Reynolds's sentencing range as follows. First, the court followed the

calculations in the presentence investigation report. It determined that, with enhancements, the wire fraud count had an adjusted offense level of 17 and the obstruction of justice count had an adjusted offense level of 19. Applying the rules for multiple counts of conviction in Part D of Chapter Three of the United States Sentencing Guidelines Manual (2003), the court grouped each count separately and assigned 1 unit to each group. Pursuant to § 3D1.4, it therefore added 2 levels to the obstruction of justice count, which had the highest offense level (19). Thus, Reynolds's combined adjusted offense level was 21. With Reynolds's criminal history category of VI, the sentencing range under the Guidelines was 77 to 96 months. Neither Reynolds nor the Government objected to this calculation of the Guidelines range.

The court then considered the Government's motion for an upward departure under § 5K2.7 of the Guidelines for significant disruption of a governmental function. According to the policy statement of § 5K2.7, an upward departure on this basis is permitted "to reflect the nature and extent of the disruption and the importance of the governmental function affected." However, it also provides that such a departure "ordinarily would not be justified when the offense of conviction is an offense such as bribery or obstruction of justice; in such cases interference with a governmental function is inherent in the offense, and unless the circumstances are unusual the guidelines will reflect the

6

appropriate punishment for such interference." U.S.S.G. § 5K2.7 (emphasis added). So as not to offend this policy statement, the court determined that it could increase Reynolds's sentence by departing on the wire fraud count only. The court reasoned that the wire fraud resulted in a substantial disruption of Buzzo's proceedings and called into question the integrity of the court.

To apply the departure only to the wire fraud count, the court recalculated Reynolds's sentencing range starting with the adjusted offense levels for each count before grouping. The court took the wire fraud's offense level of 17 and applied a 5-level § 5K2.7 upward departure to reach level 22. It then reapplied the grouping rules, this time increasing the wire fraud count's new adjusted offense level of 22 by 2 levels. The resulting total offense level of 24 increased Reynolds's sentencing range from 77 to 96 months to 100 to 125 months. The court sentenced Reynolds to 120 months' imprisonment on the wire fraud count, over Reynolds's objection to this new calculation. This appeal followed.

## II.

We first examine Reynolds's challenge to the denial of his motion for a judgment of acquittal. Reynolds argues that the evidence was insufficient to support both his wire fraud and obstruction of justice convictions. We review de novo the district court's denial of a motion for a judgment of acquittal. <u>United</u>

States v. Gallimore, 247 F.3d 134, 136 (4th Cir. 2001). "If the motion was based on insufficiency of the evidence, the verdict 'must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it.'" Id. (quoting Glasser v. United States, 315 U.S. 60, 80 (1942)).

A.

In Count Two, the superceding indictment charged Reynolds with wire fraud and aiding and abetting wire fraud. To establish the substantive crime of wire fraud, the government must prove "1) a scheme to defraud and 2) the use of a wire communication in furtherance of that scheme." United States v. Bollin, 264 F.3d 391, 407 (4th Cir. 2001) (internal quotation marks omitted). One who aids and abets the commission of an offense "is punishable as a principle." 18 U.S.C. § 2. "A defendant is guilty of aiding and abetting if he has knowingly associated himself with and participated in the criminal venture." United States v. Burgos, 94 F.3d 849, 873 (4th Cir. 1996) (en banc) (internal quotation marks omitted). We have held that "to be convicted of aiding and abetting, participation in every stage of an illegal venture is not required, only participation at some stage accompanied by knowledge of the result and intent to bring about that result." Id. (internal quotation marks and alteration marks omitted). In the specific context here:

> [T]o be convicted of aiding and abetting a wire fraud offense, it is not necessary for the defendant to be directly or personally involved in the wire communication as long as the wire communication was reasonably foreseeable to the defendant in the execution of the alleged scheme to defraud in which the defendant is accused of participating.

United States v. Pasquantino, 336 F.3d 321, 335 (4th Cir. 2003) (en banc) (citing United States v. Griffith, 17 F.3d 865, 874 (6th Cir. 1994)), aff'd on other grounds, 544 U.S. 349 (2005).

The indictment described the fraud scheme as having two specific objectives: (1) to obtain money from Buzzo by falsely claiming that Mapel was a properly licensed attorney able to represent Buzzo, and (2) to obtain money from Buzzo by falsely claiming that Mapel and Reynolds could corruptly influence public officials to provide Buzzo with a more lenient sentence. The interstate communication identified as the basis for Count Two was the February 18, 2004 call between Buzzo in West Virginia and Mapel in Arizona, during which Mapel discussed Buzzo's case, reviewed with Buzzo the "successes" of the bribery scheme, and sought the immediate payment of another $10,000.

Reynolds argues that the evidence was insufficient to convict him even under an aiding and abetting theory because he had nothing to do with the February 18, 2004 call. He points out that he and Buzzo stopped communicating after November 2003 and that thereafter Mapel downplayed his relationship with Reynolds and dismissed the connections that Reynolds purported to have when speaking to Buzzo.

9

In addition, he notes that he was neither a party to the February 18, 2004 call nor mentioned during this call. We find Reynolds's arguments to be unavailing.

First, a reasonable factfinder could conclude that Reynolds knowingly associated with and participated in the scheme to defraud. Smyth testified that Reynolds attended meetings with Mapel and the Buzzo family in 2003, with Reynolds acting as Mapel's paralegal for the case. During these meetings, Buzzo testified that Mapel and Reynolds discussed the fee for their services and, emphasizing their connections with members of the Republican party, told Buzzo and his family that "they could put a certain amount of money in the right places and could get things done." J.A. 530. In addition, the Government introduced recorded telephone conversations in which Mapel specifically discussed the purported bribery and what Buzzo was receiving in exchange for his payments to the Republicans. Although Reynolds was somewhat more cryptic than Mapel over the telephone, the jury heard several recordings of Reynolds pressuring Buzzo for money. See, e.g., J.A. 826 (Reynolds telling Buzzo, with respect to securing a sentence of home confinement, "[W]e gotta go to some people and get it done. . . . But you gotta work with us and give us, give us the, ah, the tools to work with. And I, and I think you, being who you are and what I know about you, you know what I mean.").

10

Second, the evidence supports the inference that the February 18, 2004 call between Buzzo and Mapel was reasonably foreseeable to the execution of the fraudulent scheme. Having involved himself in the scheme to defraud and having himself attempted to further that scheme through conversations with Buzzo and Smyth over the telephone, Reynolds had every reason to foresee the call that formed the basis for his conviction here. It is of no consequence that Reynolds did not participate in the conversation. See Pasquantino, 336 F.3d at 336.

Finally, to the extent that Reynolds suggests he disassociated himself from the scheme to defraud prior to the February 18, 2004 call so as to avoid culpability arising from it, neither the law nor the facts here support his contentions. As noted above, aiding and abetting does not require participation at every stage of an illegal venture, but instead requires participation at some stage accompanied by the requisite intent. Burgos, 94 F.3d at 873. Moreover, the evidence showed that Reynolds did continue to participate in the scheme up until his arrest on March 25, 2004, although he assumed a less conspicuous role. Reynolds's retreat to the background was consistent with the Government's theory that Reynolds had pushed Buzzo too hard in his demands for money and threats to cut off representation--resulting in Mapel taking over communications with the Buzzo family and outwardly distancing himself from Reynolds. In addition, Reynolds willingly met with

11

Smyth on March 25, 2004 to pick up a payment when he believed Mapel was unavailable. During that meeting he told Smyth that he was still working with Mapel on Buzzo's case and had recently prepared a motion and objections for Buzzo's sentencing. Thus, Reynolds's suggestions of abandonment or withdrawal are without merit.

Accordingly, we affirm Reynolds's conviction for aiding and abetting wire fraud.

B.

Reynolds also challenges the sufficiency of the evidence to support his conviction for obstruction of justice. He contends that because he, as a paralegal, had no affirmative duty to stop Mapel from practicing law or to inform the district court that Mapel was not licensed, he did not obstruct justice. These arguments misunderstand the law of obstruction of justice.

The obstruction of justice statute provides, in pertinent part: "Whoever . . . corruptly . . . influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished . . . ." 18 U.S.C. § 1503(a). Thus, we have required that to be guilty of obstructing justice "a defendant must have knowledge or notice of a pending judicial proceeding, and must have acted with the intent to influence, obstruct, or impede that proceeding in its due

12

administration of justice." United States v. Littleton, 76 F.3d 614, 619 (4th Cir. 1996).

Under our precedent, participation in a scheme to defraud that interferes with a judicial proceeding can satisfy the intent requirement of 18 U.S.C. § 1503. See United States v. Neiswender, 590 F.2d 1269 (4th Cir. 1979). In Neiswender, the appellant had falsely represented to an attorney that for $20,000, he could ensure a favorable outcome for the attorney's client by influencing a juror. Id. at 1270. The appellant argued that his only intent was to defraud the attorney, not to actually obstruct justice. Id. at 1272. The government argued that success in this fraud would naturally have led to an obstruction of justice because it would reduce the attorney's efforts on behalf of his client. Id. We affirmed the appellant's obstruction of justice conviction, holding that the defendant "need only have had knowledge or notice that success in his fraud would have likely resulted in an obstruction of justice." Id. at 1273. Moreover, such notice was "provided by the reasonable foreseeability of the natural and probable consequences of one's acts." Id.

Here, Reynolds plainly had knowledge of the pending judicial proceeding in Buzzo's money laundering case. The evidence also supports the reasonable inference that Reynolds possessed the requisite intent to obstruct justice. As discussed above, the evidence showed that Reynolds participated in a scheme to defraud

13

Buzzo by making him believe that his sentence could be favorably influenced through bribery. The jury could reasonably infer that it was natural and probable that this fraud would result in an obstruction of justice. Indeed, obstruction actually did result in this case. For one, Buzzo's guilty plea and plea agreement had to be thrown out, causing additional judicial resources to be expended. See United States v. Silverman, 745 F.2d 1386, 1394-95 (11th Cir. 1984) (following Neiswender to affirm conviction where a possible result of defendant's fraudulent sentence-fixing scheme was that the victim's conviction and sentence would be set aside). In addition, Buzzo and Smyth testified that they were less diligent in collecting information about Buzzo's infirmities to support his request for home confinement. See United States v. Buffalano, 727 F.2d 50, 54 (2d Cir. 1984) (applying Neiswender to affirm conviction where the defendant's fraudulent bribery scheme "had the potential to lull an 'innocent victim' into a false sense of security, deterring him from taking an active role himself to secure a more favorable sentence").

Thus, the evidence was more than sufficient to support the jury's finding of the elements of this charge. Accordingly, we affirm Reynolds's conviction for obstruction of justice.

Finally, we address the district court's grant of a five-level upward departure for a significant disruption of a governmental function pursuant to § 5K2.7 of the Guidelines.  At the outset, we note that although Reynolds's sentencing took place prior to United States v. Booker 543 U.S. 220 (2005), the argument we address here is not an assertion of Booker error, but a challenge to the calculation of the Guidelines.  This particular issue involves the district court's legal interpretation of the Guidelines, which we review de novo.  United States v. Reevey, 364 F.3d 151, 156 (4th Cir. 2004).  See also United States v. Collins, 415 F.3d 304, 315 (4th Cir. 2005) ("This court reviews 'a district court's interpretation of the applicable sentencing guidelines de novo and its factual findings for clear error.'"  (quoting United States v. Quinn, 359 F.3d 666, 679 (4th Cir. 2004))).

The "Application Instructions" for use of the Guidelines set forth nine sequential steps to be followed by the sentencing court in applying the provisions of the Guidelines manual.  See U.S.S.G. § 1B1.1.  See also United States v. Johnson, 155 F.3d 682, 684 (3d Cir. 1998) (reading the § 1B1.1 instructions "as providing a sequence of steps for the court to follow in the order in which they appear").  In the first four steps under § 1B1.1, the sentencing court must determine the offense guideline and level for each count of conviction, apply the relevant adjustments, and, as

pertinent here, group multiple counts according to the grouping guidelines in Part D of Chapter Three.  See U.S.S.G. § 1B1.1(a)-(d).  Thereafter, the court is to apply any adjustment for acceptance of responsibility, determine the defendant's criminal history category, and ascertain the guideline range and options related to probation, imprisonment, supervision conditions, fines, and restitution.  See U.S.S.G. § 1B1.1(e)-(h).  Not until the final step is the court to "[r]efer to Parts H and K of Chapter Five, Specific Offender Characteristics and Departures, and to any other policy statements or commentary in the guidelines that might warrant consideration in imposing sentence."  U.S.S.G. § 1B1.1(I).

The grouping provisions in Part D of Chapter Three reinforce the understanding that grouping is to occur before departures are considered.  Specifically, § 3D1.5 provides that sentencing courts should "[u]se the combined offense level to determine the appropriate sentence in accordance with the provisions of Chapter Five."  U.S.S.G. § 3D1.5.  See also United States v. Reis, 369 F.3d 143, 148 (2d Cir. 2004) ("It is only from this single [combined] offense level that the final sentence is calculated 'in accordance with the provisions of Chapter Five.'" (quoting U.S.S.G. § 3D1.5)); United States v. Milan, 304 F.3d 273, 296 (3d Cir. 2002) (observing that departing prior to making multiple-group adjustments would put "the departure cart before the Guidelines Range horse" (internal quotation marks omitted)).

16

Here, the district court attempted to circumvent the policy statement of § 5K2.7--that a disruption of a governmental function departure is not justified for an obstruction of justice conviction absent unusual circumstances--by departing on the wire fraud count before applying the grouping rules of Chapter Three, Part D. In so doing, the district court failed to calculate Reynolds's sentencing range according to the framework provided by the Application Instructions of § 1B1.1 and § 3D1.5. As a result, the Government effectively obtained a § 5K2.7 departure on a combined offense level that included an obstruction of justice conviction, even though the district court apparently did not believe that unusual circumstances were present. Calculating the range this way violated the § 5K2.7 policy statement, which echoes the broader goal of the Guidelines that departures should be used only where conduct has not otherwise been accounted for in the calculation of the defendant's guideline range. See United States v. Terry, 142 F.3d 702, 705 (4th Cir. 1998) ("[I]f an encouraged factor is already taken into account in the applicable guideline, or if a factor is discouraged, the sentencing court may depart 'only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present.'" (quoting Koon v. United States, 518 U.S. 81, 96 (1996)).

Due to this erroneous application of the Guidelines, Reynolds's sentencing range went from 77 to 96 months to 100 to 125

17

months, and the judge imposed a 120-month sentence.  Accordingly, we must vacate Reynolds's sentence and remand for resentencing.

IV.

In his brief, Reynolds also raised several challenges to the district court's decisions to admit or exclude certain evidence. We note that under our review, we give great deference to the evidentiary rulings of trial court judges, and will not overturn them absent an abuse of discretion.  See <u>United States v. Godwin</u>, 272 F.3d 659, 670 (4th Cir. 2001).  With that standard in mind, we have reviewed carefully each of Reynolds's challenges and found them to be without merit.  Accordingly, for the reasons stated herein, we affirm Reynolds's convictions, but vacate his sentence and remand for further proceedings consistent with this opinion.

<u>AFFIRMED IN PART;</u>
<u>VACATED AND REMANDED IN PART</u>