# Definition of Torture Under 18 U.S.C. §§ 2340–2340A

This opinion interprets the federal criminal prohibition against torture codified at 18 U.S.C. §§ 2340–2340A. It supersedes in its entirety the August 1, 2002 opinion of this Office entitled Standards of Conduct under 18 U.S.C. §§ 2340–2340A.

That statute prohibits conduct "specifically intended to inflict severe physical or mental pain or suffering." This opinion concludes that "severe" pain under the statute is not limited to "excruciating or agonizing" pain or pain "equivalent in intensity to the pain accompanying serious physical injury, such as organ failure, impairment of bodily functions, or even death."

The statute also prohibits certain conduct specifically intended to cause "severe physical suffering" distinct from "severe physical pain."

December 30, 2004

MEMORANDUM OPINION FOR THE DEPUTY ATTORNEY GENERAL

Torture is abhorrent both to American law and values and to international norms. This universal repudiation of torture is reflected in our criminal law, for example, 18 U.S.C. §§ 2340–2340A; international agreements, exemplified by the United Nations Convention Against Torture (the "CAT");[1] customary international law;[2] centuries of Anglo-American law;[3] and the longstanding policy of the United States, repeatedly and recently reaffirmed by the President.[4]

This Office interpreted the federal criminal prohibition against torture—codified at 18 U.S.C. §§ 2340–2340A—in *Standards of Conduct for Interrogation Under 18 U.S.C. §§ 2340–2340A* (Aug. 1, 2002) ("August 2002 Memorandum"). The August 2002 Memorandum also addressed a number of issues beyond interpretation of those statutory provisions, including the President's Commander

---

[1] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted by the U.N. General Assembly* Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85. *See also, e.g.*, International Covenant on Civil and Political Rights, *adopted by the U.N. General Assembly* Dec. 16, 1966, S. Exec. Doc. E, 95-2 (1978), 999 U.N.T.S. 171.

[2] It has been suggested that the prohibition against torture has achieved the status of *jus cogens* (i.e., a peremptory norm) under international law. *See, e.g.*, *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992); *Regina v. Bow Street Metro. Stipendiary Magistrate and others, Ex Parte Pinochet Ugarte (No. 3)*, [2000] 1 A.C. 147, 198; *see also* Restatement (Third) of Foreign Relations Law of the United States § 702 reporters' note 5.

[3] *See generally* John H. Langbein, *Torture and the Law* (1977).

[4] *See, e.g.*, Statement on United Nations International Day in Support of Victims of Torture, 40 Weekly Comp. Pres. Doc. 1167 (July 5, 2004) ("Freedom from torture is an inalienable human right"); Statement on United Nations International Day in Support of Victims of Torture, 39 Weekly Comp. Pres. Doc. 824 (June 30, 2003) ("Torture anywhere is an affront to human dignity everywhere."); *see also* Letter of Transmittal from President Ronald Reagan to the Senate (May 20, 1988), *in Message from the President of the United States Transmitting the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, S. Treaty Doc. No. 100-20, at iii (1988) ("Ratification of the Convention by the United States will clearly express United States opposition to torture, an abhorrent practice unfortunately still prevalent in the world today.").

in Chief power, and various defenses that might be asserted to avoid potential liability under sections 2340–2340A. *See id.* at 31–46.

Questions have since been raised, both by this Office and by others, about the appropriateness and relevance of the non-statutory discussion in the August 2002 Memorandum, and also about various aspects of the statutory analysis, in particular the statement that "severe" pain under the statute was limited to pain "equivalent in intensity to the pain accompanying serious physical injury, such as organ failure, impairment of bodily function, or even death." *Id*. at 1.[5] We decided to withdraw the August 2002 Memorandum, a decision you announced in June 2004. At that time, you directed this Office to prepare a replacement memorandum. Because of the importance of—and public interest in—these issues, you asked that this memorandum be prepared in a form that could be released to the public so that interested parties could understand our analysis of the statute.

This memorandum supersedes the August 2002 Memorandum in its entirety.[6] Because the discussion in that memorandum concerning the President's Commander in Chief power and the potential defenses to liability was—and remains—unnecessary, it has been eliminated from the analysis that follows. Consideration of the bounds of any such authority would be inconsistent with the President's unequivocal directive that United States personnel not engage in torture.[7]

We have also modified in some important respects our analysis of the legal standards applicable under 18 U.S.C. §§ 2340–2340A. For example, we disagree with statements in the August 2002 Memorandum limiting "severe" pain under the statute to "excruciating and agonizing" pain, *id*. at 19, or to pain equivalent in intensity to the pain accompanying serious physical injury, such as organ failure, impairment of bodily function, or even death," *id*. at 1. There are additional areas

---

[5] *See, e.g.*, Anthony Lewis, *Making Torture Legal*, N.Y. Rev. of Books, July 15, 2004; R. Jeffrey Smith, *Slim Legal Grounds for Torture Memos*, Wash. Post, July 4, 2004, at A12; Kathleen Clark & Julie Mertus, *Torturing the Law; the Justice Department's Legal Contortions on Interrogation*, Wash. Post, June 20, 2004, at B3; Derek Jinks & David Sloss, *Is the President Bound by the Geneva Conventions?*, 90 Cornell L. Rev. 97 (2004).

[6] This memorandum necessarily discusses the prohibition against torture in sections 2340–2340A in somewhat abstract and general terms. In applying this criminal prohibition to particular circumstances, great care must be taken to avoid approving as lawful any conduct that might constitute torture. In addition, this memorandum does not address the many other sources of law that may apply, depending on the circumstances, to the detention or interrogation of detainees (for example, the Geneva Conventions; the Uniform Code of Military Justice, 10 U.S.C. §§ 801 *et seq*.; the Military Extraterritorial Jurisdiction Act, 18 U.S.C. §§ 3261–3267; and the War Crimes Act, 18 U.S.C. § 2441, among others). Any analysis of particular facts must, of course, ensure that the United States complies with all applicable legal obligations.

[7] *See, e.g.*, Statement on United Nations International Day in Support of Victims of Torture, 40 Weekly Comp. Pres. Doc. 1167–68 (July 5, 2004) ("America stands against and will not tolerate torture. We will investigate and prosecute all acts of torture . . . in all territory under our jurisdiction. . . . Torture is wrong no matter where it occurs, and the United States will continue to lead the fight to eliminate it everywhere.").

where we disagree with or modify the analysis in the August 2002 Memorandum, as identified in the discussion below.[8]

The Criminal Division of the Department of Justice has reviewed this memorandum and concurs in the analysis set forth below.

## I.

Section 2340A provides that "[w]hoever outside the United States commits or attempts to commit torture shall be fined under this title or imprisoned not more than 20 years, or both, and if death results to any person from conduct prohibited by this subsection, shall be punished by death or imprisoned for any term of years or for life."[9] Section 2340(1) defines "torture" as "an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control."[10]

---

[8] While we have identified various disagreements with the August 2002 Memorandum, we have reviewed this Office's prior opinions addressing issues involving treatment of detainees and do not believe that any of their conclusions would be different under the standards set forth in this memorandum.

[9] Section 2340A provides in full:

(a) Offense.—Whoever outside the United States commits or attempts to commit torture shall be fined under this title or imprisoned not more than 20 years, or both, and if death results to any person from conduct prohibited by this subsection, shall be punished by death or imprisoned for any term of years or for life.

(b) Jurisdiction.—There is jurisdiction over the activity prohibited in subsection (a) if—

(1) the alleged offender is a national of the United States; or

(2) the alleged offender is present in the United States, irrespective of the nationality of the victim or alleged offender.

(c) Conspiracy.—A person who conspires to commit an offense under this section shall be subject to the same penalties (other than the penalty of death) as the penalties prescribed for the offense, the commission of which was the object of the conspiracy.

18 U.S.C. § 2340A (2000).

[10] Section 2340 provides in full:

As used in this chapter—

(1) "torture" means an act committed by a person acting under color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control;

(2) "severe mental pain or suffering" means the prolonged mental harm caused by or resulting from—

(A) the intentional infliction or threatened infliction of severe physical pain or suffering;

In interpreting these provisions, we note that Congress may have adopted a statutory definition of "torture" that differs from certain colloquial uses of the term. *Cf. Cadet v. Bulger*, 377 F.3d 1173, 1194 (11th Cir. 2004) ("[I]n other contexts and under other definitions [the conditions] might be described as torturous. The fact remains, however, that the only relevant definition of 'torture' is the definition contained in [the] CAT."). We must, of course, give effect to the statute as enacted by Congress.[11]

Congress enacted sections 2340–2340A to carry out the United States' obligations under the CAT. *See* H.R. Conf. Rep. No. 103-482, at 229 (1994). The CAT, among other things, obligates state parties to take effective measures to prevent acts of torture in any territory under their jurisdiction, and requires the United States, as a state party, to ensure that acts of torture, along with attempts and complicity to commit such acts, are crimes under U.S. law. *See* CAT arts. 2, 4–5. Sections 2340–2340A satisfy that requirement with respect to acts committed outside the United States.[12] Conduct constituting "torture" occurring within the United States was—and remains—prohibited by various other federal and state criminal statutes that we do not discuss here.

The CAT defines "torture" so as to require the intentional infliction of "severe pain or suffering, whether physical or mental." Article 1(1) of the CAT provides:

> For the purposes of this Convention, the term "torture" means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person,

---

(B) the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

(C) the threat of imminent death; or

(D) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality; and

(3) "United States" means the several States of the United States, the District of Columbia, and the commonwealths, territories, and possessions of the United States.

18 U.S.C. § 2340 (as amended by Pub. L. No. 108-375, 118 Stat. 1811 (2004)).

[11] Our task is only to offer guidance on the meaning of the statute, not to comment on policy. It is of course open to policymakers to determine that conduct that might not be prohibited by the statute is nevertheless contrary to the interests or policy of the United States.

[12] Congress limited the territorial reach of the federal torture statute, providing that the prohibition applies only to conduct occurring "outside the United States," 18 U.S.C. § 2340A(a), which is currently defined in the statute to mean outside "the several States of the United States, the District of Columbia, and the commonwealths, territories, and possessions of the United States." *Id.* § 2340(3).

or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

The Senate attached the following understanding to its resolution of advice and consent to ratification of the CAT:

The United States understands that, in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering and that mental pain or suffering refers to prolonged mental harm caused by or resulting from (1) the intentional infliction or threatened infliction of severe physical pain or suffering; (2) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality; (3) the threat of imminent death; or (4) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

S. Exec. Rep. No. 101-30, at 36 (1990). This understanding was deposited with the U.S. instrument of ratification on October 21, 1994, *see* 1830 U.N.T.S. 320, and thus defines the scope of the United States' obligations under the treaty. *See Relevance of Senate Ratification History to Treaty Interpretation*, 11 Op. O.L.C. 28, 32–33 (1987). The criminal prohibition against torture that Congress codified in 18 U.S.C. §§ 2340–2340A generally tracks the prohibition in the CAT, subject to the U.S. understanding.

## II.

Under the language adopted by Congress in sections 2340–2340A, to constitute "torture," the conduct in question must have been "specifically intended to inflict severe physical or mental pain or suffering." In the discussion that follows, we will separately consider each of the principal components of this key phrase: (1) the meaning of "severe"; (2) the meaning of "severe physical pain or suffering"; (3) the meaning of "severe mental pain or suffering"; and (4) the meaning of "specifically intended."

### A. The Meaning of "Severe"

Because the statute does not define "severe," "we construe [the] term in accordance with its ordinary or natural meaning." *FDIC v. Meyer*, 510 U.S. 471, 476

(1994). The common understanding of the term "torture" and the context in which the statute was enacted also inform our analysis.

Dictionaries define "severe" (often conjoined with "pain") to mean "extremely violent or intense: *severe pain*." *American Heritage Dictionary of the English Language* 1653 (3d ed. 1992); *see also* 15 *Oxford English Dictionary* 101 (2d ed. 1989) ("Of pain, suffering, loss, or the like: Grievous, extreme" and "Of events or circumstances . . . : Hard to sustain or endure").[13]

The statute, moreover, was intended to implement the United States' obligations under the CAT, which, as quoted above, defines as "torture" acts that inflict "severe pain or suffering" on a person. CAT art. 1(1). As the Senate Foreign Relations Committee explained in its report recommending that the Senate consent to ratification of the CAT:

> The [CAT] seeks to define "torture" in a relatively limited fashion, corresponding to the common understanding of torture as an extreme practice which is universally condemned. . . .
>
> The term "torture," in United States and international usage, is usually reserved for extreme, deliberate and unusually cruel practices, for example, sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain.

S. Exec. Rep. No. 101-30, at 13–14. *See also* David P. Stewart, *The Torture Convention and the Reception of International Criminal Law Within the United States*, 15 Nova L. Rev. 449, 455 (1991) ("By stressing the extreme nature of torture, . . . [the] definition [of torture in the CAT] describes a relatively limited set of circumstances likely to be illegal under most, if not all, domestic legal systems.").

Further, the CAT distinguishes between torture and "other acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture as

---

[13] Common dictionary definitions of "torture" further support the statutory concept that the pain or suffering must be severe. *See Black's Law Dictionary* 1528 (8th ed. 2004) (defining "torture" as "[t]he infliction of *intense pain* to the body or mind to punish, to extract a confession or information, or to obtain sadistic pleasure") (emphasis added); *Webster's Third New International Dictionary of the English Language Unabridged* 2414 (2002) (defining "torture" as "the infliction of *intense pain* (as from burning, crushing, wounding) to punish or coerce someone") (emphasis added); *Oxford American Dictionary and Language Guide* 1064 (1999) (defining "torture" as "the infliction of *severe bodily pain*, esp. as a punishment or a means of persuasion") (emphasis added).

This interpretation is also consistent with the history of torture. See generally the descriptions in Lord Hope's lecture, *Torture*, University of Essex/Clifford Chance Lecture 7–8 (Jan. 28, 2004), and in Professor Langbein's book, *Torture and the Law of Proof: Europe and England in the Ancien Régime.* We emphatically are not saying that only such historical techniques—or similar ones—can constitute "torture" under sections 2340–2340A. But the historical understanding of "torture" is relevant to interpreting Congress's intent. *Cf. Morissette v. United States*, 342 U.S. 246, 263 (1952).

defined in article 1." CAT art. 16. The CAT thus treats torture as an "extreme form" of cruel, inhuman, or degrading treatment. *See* S. Exec. Rep. No. 101-30, at 6, 13; *see also* J. Herman Burgers & Hans Danelius, *The United Nations Convention Against Torture: A Handbook on the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* 80 (1988) ("*CAT Handbook*") (noting that Article 16 implies "that torture is the *gravest form* of [cruel, inhuman, or degrading] treatment [or] punishment") (emphasis added); Malcolm D. Evans, *Getting to Grips with Torture*, 51 Int'l & Comp. L.Q. 365, 369 (2002) (The CAT "formalises a distinction between torture on the one hand and inhuman and degrading treatment on the other by attributing different legal consequences to them.").[14] The Senate Foreign Relations Committee emphasized this point in its report recommending that the Senate consent to ratification of the CAT. *See* S. Exec. Rep. No. 101-30, at 13 ("'Torture' is thus to be distinguished from lesser forms of cruel, inhuman, or degrading treatment or punishment, which are to be deplored and prevented, but are not so universally and categorically

---

[14] This approach—distinguishing torture from lesser forms of cruel, inhuman, or degrading treatment—is consistent with other international law sources. The CAT's predecessor, the U.N. Torture Declaration, defined torture as "an aggravated and deliberate form of cruel, inhuman or degrading treatment or punishment." Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, U.N. Res. 3452, art. 1(2) (Dec. 9, 1975) (emphasis added); *see also* S. Treaty Doc. No. 100-20 at 2 (The U.N. Torture Declaration was "a point of departure for the drafting of the [CAT]."). Other treaties also distinguish torture from lesser forms of cruel, inhuman, or degrading treatment. *See, e.g.*, European Convention for the Protection of Human Rights and Fundamental Freedoms art. 3, Nov. 4, 1950, 213 U.N.T.S. 221 ("European Convention") ("No one shall be subjected to torture or to inhuman or degrading treatment or punishment."); Evans, Getting to Grips with Torture, 51 Int'l & Comp. L.Q. at 370 ("[T]he ECHR [European Court of Human Rights] organs have adopted . . . a 'vertical' approach . . . , which is seen as comprising three separate elements, each representing a progression of seriousness, in which one moves progressively from forms of ill-treatment which are 'degrading' to those which are 'inhuman' and then to 'torture.' The distinctions between them is [sic] based on the severity of suffering involved, with 'torture' at the apex."); Debra Long, Association for the Prevention of Torture, *Guide to Jurisprudence on Torture and Ill-Treatment: Article 3 of the European Convention for the Protection of Human Rights* 13 (2002) (The approach of distinguishing between "torture," "inhuman" acts, and "degrading" acts has "remained the standard approach taken by the European judicial bodies. Within this approach torture has been singled out as carrying a special stigma, which distinguishes it from other forms of ill-treatment."). *See also* CAT Handbook at 115–17 (discussing the ECHR decision in *Ireland v. United Kingdom*, 25 Eur. Ct. H.R. (ser. A) (1978)) (concluding that the combined use of wall-standing, hooding, subjection to noise, deprivation of sleep, and deprivation of food and drink constituted inhuman or degrading treatment but not torture under the European Convention). Cases decided by the ECHR subsequent to Ireland have continued to view torture as an aggravated form of inhuman treatment. *See, e.g.*, *Aktaş v. Turkey*, App. No. 24351/94, ¶ 313 (Eur. Ct. H.R. 2003); *Akkoç v. Turkey*, Apps. Nos. 22947/93 & 22948/93, ¶ 115 (Eur. Ct. H.R. 2000); *Kaya v. Turkey*, App. No. 22535/93, ¶ 117 (Eur. Ct. H.R. 2000).

The International Criminal Tribunal for the Former Yugoslavia ("ICTY") likewise considers "torture" as a category of conduct more severe than "inhuman treatment." *See, e.g.*, *Prosecutor v. Delalic*, Case No. IT-96-21, Trial Chamber Judgment ¶ 542 (Int'l Crim. Trib. for the Former Yugoslavia Nov. 16, 1998) ("[I]nhuman treatment is treatment which deliberately causes serious mental and physical suffering that falls short of the severe mental and physical suffering required for the offence of torture.").

condemned as to warrant the severe legal consequences that the Convention provides in the case of torture. . . . The requirement that torture be an extreme form of cruel and inhuman treatment is expressed in Article 16, which refers to 'other acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture . . . .'"). *See also Cadet*, 377 F.3d at 1194 ("The definition in CAT draws a critical distinction between 'torture' and 'other acts of cruel, inhuman, or degrading punishment or treatment.'").

Representations made to the Senate by executive branch officials when the Senate was considering the CAT are also relevant in interpreting the CAT's torture prohibition—which sections 2340–2340A implement. Mark Richard, a Deputy Assistant Attorney General in the Criminal Division, testified that "[t]orture is understood to be that barbaric cruelty which lies at the top of the pyramid of human rights misconduct." *Convention Against Torture: Hearing Before the Senate Comm. on Foreign Relations*, 101st Cong. 16 (1990) ("*CAT Hearing*") (prepared statement). The Senate Foreign Relations Committee also understood torture to be limited in just this way. *See* S. Exec. Rep. No. 101-30, at 6 (noting that "[f]or an act to be 'torture,' it must be an extreme form of cruel and inhuman treatment, causing severe pain and suffering, and be intended to cause severe pain and suffering"). Both the Executive Branch and the Senate acknowledged the efforts of the United States during the negotiating process to strengthen the effectiveness of the treaty and to gain wide adherence thereto by focusing the Convention "on torture rather than on other relatively less abhorrent practices." Letter of Submittal from George P. Shultz, Secretary of State, to President Ronald Reagan (May 10, 1988), *in* S. Treaty Doc. No. 100-20, at v; *see also* S. Exec. Rep. No. 101-30, at 2–3 ("The United States" helped to focus the Convention "on torture rather than other less abhorrent practices."). Such statements are probative of a treaty's meaning. *See* 11 Op. O.L.C. at 35–36.

Although Congress defined "torture" under sections 2340–2340A to require conduct specifically intended to cause "severe" pain or suffering, we do not believe Congress intended to reach only conduct involving "excruciating and agonizing" pain or suffering. Although there is some support for this formulation in the ratification history of the CAT,[15] a proposed express understanding to that effect[16] was "criticized for setting too high a threshold of pain," S. Exec. Rep. No. 101-30, at 9, and was not adopted. We are not aware of any evidence suggesting that the standard was raised in the statute and we do not believe that it was.[17]

---

[15] Deputy Assistant Attorney General Mark Richard testified: "[T]he essence of torture" is treatment that inflicts "excruciating and agonizing physical pain." *CAT Hearing* at 16 (prepared statement).

[16] *See* S. Treaty Doc. No. 100-20, at 4–5 ("The United States understands that, in order to constitute torture, an act must be a deliberate and calculated act of an extremely cruel and inhuman nature, specifically intended to inflict excruciating and agonizing physical or mental pain or suffering.").

[17] Thus, we do not agree with the statement in the August 2002 Memorandum that "[t]he Reagan administration's understanding that the pain be 'excruciating and agonizing' is in substance not different from the Bush administration's proposal that the pain must be severe." *Id.* at 19. Although the terms are concededly imprecise, and whatever the intent of the Reagan Administration's understanding,

Drawing distinctions among gradations of pain (for example, severe, mild, moderate, substantial, extreme, intense, excruciating, or agonizing) is obviously not an easy task, especially given the lack of any precise, objective scientific criteria for measuring pain.[18] We are, however, aided in this task by judicial interpretations of the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350 note (2000). The TVPA, also enacted to implement the CAT, provides a civil remedy to victims of torture. The TVPA defines "torture" to include:

> any act, directed against an individual in the offender's custody or physical control, by which *severe pain or suffering* (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), *whether physical or mental*, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual

---

we believe that in common usage "excruciating and agonizing" pain is understood to be more intense than "severe" pain.

The August 2002 Memorandum also looked to the use of "severe pain" in certain other statutes, and concluded that to satisfy the definition in section 2340, pain "must be equivalent in intensity to the pain accompanying serious physical injury, such as organ failure, impairment of bodily function, or even death." *Id.* at 1; *see also id.* at 5–6, 13, 46. We do not agree with those statements. Those other statutes define an "emergency medical condition," for purposes of providing health benefits, as "a condition manifesting itself by acute symptoms of sufficient severity (including severe pain)" such that one could reasonably expect that the absence of immediate medical care might result in death, organ failure or impairment of bodily function. *See, e.g.*, 8 U.S.C. § 1369 (2000); 42 U.S.C. § 1395w-22(d)(3)(B) (2000); *id.* § 1395dd(e) (2000). They do not define "severe pain" even in that very different context (rather, they use it as an indication of an "emergency medical condition"), and they do not state that death, organ failure, or impairment of bodily function cause "severe pain," but rather that "severe pain" may indicate a condition that, if untreated, could cause one of those results. We do not believe that they provide a proper guide for interpreting "severe pain" in the very different context of the prohibition against torture in sections 2340–2340A. *Cf. United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 213 (2001) (phrase "wages paid" has different meaning in different parts of Title 26); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 343–44 (1997) (term "employee" has different meanings in different parts of Title VII).

[18] Despite extensive efforts to develop objective criteria for measuring pain, there is no clear, objective, consistent measurement. As one publication explains:

> Pain is a complex, subjective, perceptual phenomenon with a number of dimensions—intensity, quality, time course, impact, and personal meaning—that are uniquely experienced by each individual and, thus, can only be assessed indirectly. *Pain is a subjective experience and there is no way to objectively quantify it.* Consequently, assessment of a patient's pain depends on the patient's overt communications, both verbal and behavioral. Given pain's complexity, one must assess not only its somatic (sensory) component but also patients' moods, attitudes, coping efforts, resources, responses of family members, and the impact of pain on their lives.

Dennis C. Turk, *Assess the Person, Not Just the Pain*, Pain: Clinical Updates, Sept. 1993 (emphasis added). This lack of clarity further complicates the effort to define "severe" pain or suffering.

or a third person, or for any reason based on discrimination of any kind . . . .

28 U.S.C. § 1350 note, § 3(b)(1) (emphases added). The emphasized language is similar to section 2340's "severe physical or mental pain or suffering."[19] As the Court of Appeals for the District of Columbia Circuit has explained:

> The severity requirement is crucial to ensuring that the conduct pro-scribed by the [CAT] and the TVPA is sufficiently extreme and out-rageous to warrant the universal condemnation that the term "tor-ture" both connotes and invokes. The drafters of the [CAT], as well as the Reagan Administration that signed it, the Bush Administration that submitted it to Congress, and the Senate that ultimately ratified it, therefore all sought to ensure that "only acts of a certain gravity shall be considered to constitute torture."
>
> The critical issue is the degree of pain and suffering that the al-leged torturer intended to, and actually did, inflict upon the victim. The more intense, lasting, or heinous the agony, the more likely it is to be torture.

*Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 92–93 (D.C. Cir. 2002) (citations omitted). That court concluded that a complaint that alleged beatings at the hands of police but that did not provide details concerning "the severity of plaintiffs' alleged beatings, including their frequency, duration, the parts of the body at which they were aimed, and the weapons used to carry them out," did not suffice "to ensure that [it] satisf[ied] the TVPA's rigorous definition of torture." *Id*. at 93.

In *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230 (D.C. Cir. 2003), the D.C. Circuit again considered the types of acts that constitute torture under the TVPA definition. The plaintiff alleged, among other things, that Libyan authorities had held her incommunicado and threatened to kill her if she tried to leave. *See id.* at 232, 234. The court acknowledged that "these alleged acts certainly reflect a bent toward cruelty on the part of their perpetrators," but, reversing the district court, went on to hold that "they are not in themselves so unusually cruel or sufficiently extreme and outrageous as to constitute torture within the meaning of the [TVPA]." *Id*. at 234. Cases in which courts have found torture suggest the nature of the extreme conduct that falls within the statutory definition. *See, e.g.*, *Hilao v. Estate of Marcos*, 103 F.3d 789, 790–91, 795 (9th Cir. 1996) (concluding that a course of conduct that included, among other things, severe beatings of plaintiff, repeated threats of death and electric shock, sleep

---

[19] Section 3(b)(2) of the TVPA defines "mental pain or suffering" similarly to the way that section 2340(2) defines "severe mental pain or suffering."

deprivation, extended shackling to a cot (at times with a towel over his nose and mouth and water poured down his nostrils), seven months of confinement in a "suffocatingly hot" and cramped cell, and eight years of solitary or near-solitary confinement constituted torture); *Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322, 1332–40, 1345–46 (N.D. Ga. 2002) (concluding that a course of conduct that included, among other things, severe beatings to the genitals, head, and other parts of the body with metal pipes, brass knuckles, batons, a baseball bat, and various other items; removal of teeth with pliers; kicking in the face and ribs; breaking of bones and ribs and dislocation of fingers; cutting a figure into the victim's forehead; hanging the victim and beating him; extreme limitations of food and water; and subjection to games of "Russian roulette" constituted torture); *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 22–23 (D.D.C. 2001) (entering default judgment against Iraq where plaintiffs alleged, among other things, threats of "physical torture, such as cutting off . . . fingers, pulling out . . . fingernails," and electric shocks to the testicles); *Cicippio v. Islamic Republic of Iran*, 18 F. Supp. 2d 62, 64–66 (D.D.C. 1998) (concluding that a course of conduct that included frequent beatings, pistol whipping, threats of imminent death, electric shocks, and attempts to force confessions by playing Russian roulette and pulling the trigger at each denial constituted torture).

## B. The Meaning of "Severe Physical Pain or Suffering"

The statute provides a specific definition of "severe mental pain or suffering," 18 U.S.C. § 2340(2), but does not define the term "severe physical pain or suffering." Although we think the meaning of "severe physical pain" is relatively straightforward, the question remains whether Congress intended to prohibit a category of "severe physical suffering" distinct from "severe physical pain." We conclude that under some circumstances "severe physical suffering" may constitute torture even if it does not involve "severe physical pain." Accordingly, to the extent that the August 2002 Memorandum suggested that "severe physical suffering" under the statute could in no circumstances be distinct from "severe physical pain," *id.* at 6 n.3, we do not agree.

We begin with the statutory language. The inclusion of the words "or suffering" in the phrase "severe physical pain or suffering" suggests that the statutory category of physical torture is not limited to "severe physical pain." This is especially so in light of the general principle against interpreting a statute in such a manner as to render words surplusage. *See, e.g.*, *Duncan v. Walker*, 533 U.S. 167, 174 (2001).

Exactly what is included in the concept of "severe physical suffering," however, is difficult to ascertain. We interpret the phrase in a statutory context where Congress expressly distinguished "physical pain or suffering" from "mental pain or suffering." Consequently, a separate category of "physical suffering" must

include something other than any type of "mental pain or suffering." [20] Moreover, given that Congress precisely defined "mental pain or suffering" in the statute, it is unlikely to have intended to undermine that careful definition by including a broad range of mental sensations in a "physical suffering" component of "physical pain or suffering."[21] Consequently, "physical suffering" must be limited to adverse "physical" rather than adverse "mental" sensations.

The text of the statute and the CAT, and their history, provide little concrete guidance as to what Congress intended separately to include as "severe physical suffering." Indeed, the record consistently refers to "severe physical pain or suffering" (or, more often in the ratification record, "severe physical pain and suffering"), apparently without ever disaggregating the concepts of "severe physical pain" and "severe physical suffering" or discussing them as separate categories with separate content. Although there is virtually no legislative history for the statute, throughout the ratification of the CAT—which also uses the disjunctive "pain or suffering" and which the statutory prohibition implements— the references were generally to "pain and suffering," with no indication of any difference in meaning. The Summary and Analysis of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, which appears in S. Treaty Doc. No. 100-20, at 3, for example, repeatedly refers to "pain and suffering." *See also* S. Exec. Rep. No. 101-30, at 6 (three uses of "pain and suffering"); *id*. at 13 (eight uses of "pain and suffering"); id. at 14 (two uses of "pain and suffering"); *id*. at 35 (one use of "pain and suffering"). Conversely, the phrase "pain or suffering" is used less frequently in the Senate report in discussing (as opposed to quoting) the CAT and the understandings under consideration, e.g.,

---

[20] Common dictionary definitions of "physical" confirm that "physical suffering" does not include mental sensations. *See, e.g.*, *American Heritage Dictionary of the English Language* at 1366 ("Of or relating to the body as distinguished from the mind or spirit"); *Oxford American Dictionary and Language Guide* at 748 ("of of or concerning the body (*physical exercise*; *physical education*)").

[21] This is particularly so given that, as Administration witnesses explained, the limiting understanding defining mental pain or suffering was considered necessary to avoid problems of vagueness. *See, e.g.*, CAT Hearing at 8, 10 (prepared statement of Abraham Sofaer, Legal Adviser, Department of State) ("The Convention's wording . . . is not in all respects as precise as we believe necessary. . . . [B]ecause [the Convention] requires establishment of criminal penalties under our domestic law, we must pay particular attention to the meaning and interpretation of its provisions, especially concerning the standards by which the Convention will be applied as a matter of U.S. law. . . . [W]e prepared a codified proposal which . . . clarifies the definition of mental pain and suffering."); *id*. at 15–16 (prepared statement of Mark Richard) ("The basic problem with the Torture Convention—one that permeates all our concerns—is its imprecise definition of torture, especially as that term is applied to actions which result solely in mental anguish. This definitional vagueness makes it very doubtful that the United States can, consistent with Constitutional due process constraints, fulfill its obligation under the Convention to adequately engraft the definition of torture into the domestic criminal law of the United States."); *id*. at 17 (prepared statement of Mark Richard) ("Accordingly, the Torture Convention's vague definition concerning the mental suffering aspect of torture cannot be resolved by reference to established principles of international law. In an effort to overcome this unacceptable element of vagueness in Article I of the Convention, we have proposed an understanding which defines severe mental pain constituting torture with sufficient specificity to . . . meet Constitutional due process requirements.").

*id*. at 5–6 (one use of "pain or suffering"), *id*. at 14 (two uses of "pain or suffering"); *id*. at 16 (two uses of "pain or suffering"), and, when used, it is with no suggestion that it has any different meaning.

Although we conclude that inclusion of the words "or suffering" in "severe physical pain or suffering" establishes that physical torture is not limited to "severe physical pain," we also conclude that Congress did not intend "severe physical pain or suffering" to include a category of "physical suffering" that would be so broad as to negate the limitations on the other categories of torture in the statute. Moreover, the "physical suffering" covered by the statute must be "severe" to be within the statutory prohibition. We conclude that under some circumstances "physical suffering" may be of sufficient intensity and duration to meet the statutory definition of torture even if it does not involve "severe physical pain." To constitute such torture, "*severe* physical suffering" would have to be a condition of some extended duration or persistence as well as intensity. The need to define a category of "severe physical suffering" that is different from "severe physical pain," and that also does not undermine the limited definition Congress provided for torture, along with the requirement that any such physical suffering be "severe," calls for an interpretation under which "severe physical suffering" is reserved for physical distress that is "severe" considering its intensity and duration or persistence, rather than merely mild or transitory.[22] Otherwise, the inclusion of such a category would lead to the kind of uncertainty in interpreting the statute that Congress sought to reduce both through its understanding to the CAT and in sections 2340–2340A.

## C. The Meaning of "Severe Mental Pain or Suffering"

Section 2340 defines "severe mental pain or suffering" to mean:

the prolonged mental harm caused by or resulting from—

(A) the intentional infliction or threatened infliction of severe physical pain or suffering;

(B) the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

---

[22] Support for concluding that there is an extended temporal element, or at least an element of persistence, in "severe physical suffering" as a category distinct from "severe physical pain" may also be found in the prevalence of concepts of "endurance" of suffering and of suffering as a "state" or "condition" in standard dictionary definitions. *See, e.g.*, *Webster's Third New International Dictionary* at 2284 (defining "suffering" as "the endurance of or submission to affliction, pain, loss"; "a pain endured"); *Random House Dictionary of the English Language* 1901 (2d ed. 1987) ("the state of a person or thing that suffers"); *Funk & Wagnalls New Standard Dictionary of the English Language* 2416 (1946) ("A state of anguish or pain"); *American Heritage Dictionary of the English Language* at 1795 ("The condition of one who suffers").

(C) the threat of imminent death; or

(D) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality[.]

18 U.S.C. § 2340(2). Torture is defined under the statute to include an act specifically intended to inflict severe mental pain or suffering. *Id.* § 2340(1).

An important preliminary question with respect to this definition is whether the statutory list of the four "predicate acts" in section 2340(2)(A)–(D) is exclusive. We conclude that Congress intended the list of predicate acts to be exclusive—that is, to constitute the proscribed "severe mental pain or suffering" under the statute, the prolonged mental harm must be caused by acts falling within one of the four statutory categories of predicate acts. We reach this conclusion based on the clear language of the statute, which provides a detailed definition that includes four categories of predicate acts joined by the disjunctive and does not contain a catch-all provision or any other language suggesting that additional acts might qualify (for example, language such as "including" or "such acts as").[23] Congress plainly considered very specific predicate acts, and this definition tracks the Senate's understanding concerning mental pain or suffering when giving its advice and consent to ratification of the CAT. The conclusion that the list of predicate acts is exclusive is consistent with both the text of the Senate's understanding and the fact that it was adopted out of concern that the CAT's definition of torture did not otherwise meet the requirement for clarity in defining crimes. *See supra* note 21. Adopting an interpretation of the statute that expands the list of predicate acts for "severe mental pain or suffering" would constitute an impermissible rewriting of the statute and would introduce the very imprecision that prompted the Senate to adopt its understanding when giving its advice and consent to ratification of the CAT.

Another question is whether the requirement of "prolonged mental harm" caused by or resulting from one of the enumerated predicate acts is a separate requirement, or whether such "prolonged mental harm" is to be presumed any time one of the predicate acts occurs. Although it is possible to read the statute's reference to "*the* prolonged mental harm caused by or resulting from" the predicate acts as creating a statutory presumption that each of the predicate acts always causes prolonged mental harm, we do not believe that was Congress's intent. As

---

[23] These four categories of predicate acts "are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (quoting *United States v. Vonn*, 535 U.S. 55, 65 (2002)). *See also, e.g.*, *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993); 2A Norman J. Singer, *Statutes and Statutory Construction* § 47.23 (6th ed. 2000). Nor do we see any "contrary indications" that would rebut this inference. *Vonn*, 535 U.S. at 65.

noted, this language closely tracks the understanding that the Senate adopted when it gave its advice and consent to ratification of the CAT:

> in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering and that mental pain or suffering refers to prolonged mental harm caused by or resulting from (1) the intentional infliction or threatened infliction of severe physical pain or suffering; (2) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality; (3) the threat of imminent death; or (4) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

S. Exec. Rep. No. 101-30, at 36. We do not believe that simply by adding the word "the" before "prolonged harm," Congress intended a material change in the definition of mental pain or suffering as articulated in the Senate's understanding to the CAT. The legislative history, moreover, confirms that sections 2340–2340A were intended to fulfill—but not go beyond—the United States' obligations under the CAT: "This section provides the necessary legislation to implement the [CAT]. . . . The definition of torture emanates directly from article 1 of the [CAT]. The definition for 'severe mental pain and suffering' incorporates the [above mentioned] understanding." S. Rep. No. 103-107, at 58–59 (1993). This understanding, embodied in the statute, was meant to define the obligation undertaken by the United States. Given this understanding, the legislative history, and the fact that section 2340(2) defines "severe mental pain or suffering" carefully in language very similar to the understanding, we do not believe that Congress intended the definition to create a presumption that any time one of the predicate acts occurs, prolonged mental harm is deemed to result.

Turning to the question of what constitutes "prolonged mental harm caused by or resulting from" a predicate act, we believe that Congress intended this phrase to require mental "harm" that is caused by or that results from a predicate act, and that has some lasting duration. There is little guidance to draw upon in interpreting this phrase.[24] Nevertheless, our interpretation is consistent with the ordinary meaning of the statutory terms. First, the use of the word "harm"—as opposed to simply repeating "pain or suffering"—suggests some mental damage or injury.

---

[24] The phrase "prolonged mental harm" does not appear in the relevant medical literature or elsewhere in the United States Code. The August 2002 Memorandum concluded that to constitute "prolonged mental harm," there must be "significant psychological harm of significant duration, e.g., lasting for months or even years." *Id.* at 1; *see also id.* at 7. Although we believe that the mental harm must be of some lasting duration to be "prolonged," to the extent that that formulation was intended to suggest that the mental harm would have to last for at least "months or even years," we do not agree.

Ordinary dictionary definitions of "harm," such as "physical or mental *damage: injury*," *Webster's Third New International Dictionary* at 1034 (emphasis added), or "[p]hysical or psychological *injury or damage*," *American Heritage Dictionary of the English Language* at 825 (emphasis added), support this interpretation. Second, to "prolong" means to "lengthen in time" or to "extend in duration," or to "draw out," *Webster's Third New International Dictionary* at 1815, further suggesting that to be "prolonged," the mental damage must extend for some period of time. This damage need not be permanent, but it must continue for a "prolonged" period of time.[25] Finally, under section 2340(2), the "prolonged mental harm" must be "caused by" or "resulting from" one of the enumerated predicate acts.[26]

Although there are few judicial opinions discussing the question of "prolonged mental harm," those cases that have addressed the issue are consistent with our view. For example, in the TVPA case of *Mehinovic*, the court explained that:

> [The defendant] also caused or participated in the plaintiffs' mental torture. Mental torture consists of "prolonged mental harm caused by or resulting from: the intentional infliction or threatened infliction of severe physical pain or suffering; . . . the threat of imminent death . . . ." As set out above, plaintiffs noted in their testimony that they feared that they would be killed by [the defendant] during the beatings he inflicted or during games of "Russian roulette." *Each plaintiff continues to suffer long-term psychological harm as a result of the ordeals they suffered at the hands of defendant and others.*

198 F. Supp. 2d at 1346 (emphasis added; first ellipsis in original). In reaching its conclusion, the court noted that the plaintiffs were continuing to suffer serious

---

[25] For example, although we do not suggest that the statute is limited to such cases, development of a mental disorder—such as post-traumatic stress disorder or perhaps chronic depression—could constitute "prolonged mental harm." *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 369–76, 463–68 (4th ed. 2000) ("DSM-IV-TR"). *See also, e.g.*, Special Rapporteur of the Commission on Human Rights, *Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* ¶ 49, U.N. Doc. A/59/324, at 14 (Sept. 1, 2004) (by Theo van Boven) ("The most common diagnosis of psychiatric symptoms among torture survivors is said to be post-traumatic stress disorder."); *see also* Metin Basoglu et al., *Torture and Mental Health: A Research Overview*, *in The Mental Health Consequences of Torture* 48–49 (Ellen Gerrity et al. eds., 2001) (referring to findings of higher rates of post-traumatic stress disorder in studies involving torture survivors); Murat Parker et al., *Psychological Effects of Torture: An Empirical Study of Tortured and Non-Tortured Non-Political Prisoners*, *in Torture and Its Consequences: Current Treatment Approaches* 77 (Metin Basoglu ed., 1992) (referring to findings of post-traumatic stress disorder in torture survivors).

[26] This is not meant to suggest that, if the predicate act or acts continue for an extended period, "prolonged mental harm" cannot occur until after they are completed. Early occurrences of the predicate act could cause mental harm that could continue—and become prolonged—during the extended period the predicate acts continued to occur. For example, in *Sackie v. Ashcroft*, 270 F. Supp. 2d 596, 601–02 (E.D. Pa. 2003), the predicate acts continued over a three-to-four-year period, and the court concluded that "prolonged mental harm" had occurred during that time.

mental harm even ten years after the events in question: One plaintiff "suffers from anxiety, flashbacks, and nightmares and has difficulty sleeping. [He] continues to suffer thinking about what happened to him during this ordeal and has been unable to work as a result of the continuing effects of the torture he endured." *Id.* at 1334. Another plaintiff "suffers from anxiety, sleeps very little, and has frequent nightmares. . . . [He] has found it impossible to return to work." *Id.* at 1336. A third plaintiff "has frequent nightmares. He has had to use medication to help him sleep. His experience has made him feel depressed and reclusive, and he has not been able to work since he escaped from this ordeal." *Id.* at 1337–38. And the fourth plaintiff "has flashbacks and nightmares, suffers from nervousness, angers easily, and has difficulty trusting people. These effects directly impact and interfere with his ability to work." *Id.* at 1340. In each case, these mental effects were continuing years after the infliction of the predicate acts.

And in *Sackie v. Ashcroft*, 270 F. Supp. 2d 596 (E.D. Pa. 2003), the individual had been kidnapped and "forcibly recruited" as a child soldier at the age of 14, and over the next three to four years had been forced to take narcotics and threatened with imminent death. *Id.* at 597–98, 601–02. The court concluded that the resulting mental harm, which continued over this three-to-four-year period, qualified as "prolonged mental harm." *Id.* at 602.

Conversely, in *Villeda Aldana v. Fresh Del Monte Produce, Inc.*, 305 F. Supp. 2d 1285 (S.D. Fla. 2003), the court rejected a claim under the TVPA brought by individuals who had been held at gunpoint overnight and repeatedly threatened with death. While recognizing that the plaintiffs had experienced an "ordeal," the court concluded that they had failed to show that their experience caused lasting damage, noting that "there is simply no allegation that Plaintiffs have suffered any prolonged mental harm or physical injury as a result of their alleged intimidation." *Id.* at 1294–95.

### D. The Meaning of "Specifically Intended"

It is well recognized that the term "specific intent" is ambiguous and that the courts do not use it consistently. *See* 1 Wayne R. LaFave, *Substantive Criminal Law* § 5.2(e), at 355 & n.79 (2d ed. 2003). "Specific intent" is most commonly understood, however, "to designate a special mental element which is required above and beyond any mental state required with respect to the *actus reus* of the crime." *Id.* at 354; *see also Carter v. United States*, 530 U.S. 255, 268 (2000) (explaining that general intent, as opposed to specific intent, requires "that the defendant possessed knowledge [only] with respect to the *actus reus* of the crime"). As one respected treatise explains:

> With crimes which require that the defendant intentionally cause a specific result, what is meant by an "intention" to cause that result? Although the theorists have not always been in agreement . . . , the traditional view is that a person who acts . . . intends a result of his

act . . . under two quite different circumstances: (1) when he con-
sciously desires that result, whatever the likelihood of that result
happening from his conduct; and (2) when he knows that that result
is practically certain to follow from his conduct, whatever his desire
may be as to that result.

1 LaFave, *Substantive Criminal Law*, § 5.2(a), at 341 (footnote omitted).

As noted, the cases are inconsistent. Some suggest that only a conscious desire
to produce the proscribed result constitutes specific intent; others suggest that even
reasonable foreseeability suffices. In *United States v. Bailey*, 444 U.S. 394 (1980),
for example, the Court suggested that, at least "[i]n a general sense," *id.* at 405,
"specific intent" requires that one consciously desire the result. *Id.* at 403–05. The
Court compared the common law's *mens rea* concepts of specific intent and
general intent to the Model Penal Code's *mens rea* concepts of acting purposefully
and acting knowingly. *Id.* at 404–05. "[A] person who causes a particular result is
said to act purposefully," wrote the Court, "if 'he consciously desires that result,
whatever the likelihood of that result happening from his conduct.'" *Id.* at 404
(internal quotation marks omitted). A person "is said to act knowingly," in
contrast, "if he is aware 'that that result is practically certain to follow from his
conduct, whatever his desire may be as to that result.'" *Id.* (internal quotation
marks omitted). The Court then stated: "In a general sense, 'purpose' corresponds
loosely with the common-law concept of specific intent, while 'knowledge'
corresponds loosely with the concept of general intent." *Id.* at 405.

In contrast, cases such as *United States v. Neiswender*, 590 F.2d 1269 (4th Cir.
1979), suggest that to prove specific intent it is enough that the defendant simply
have "knowledge or notice" that his act "would have likely resulted in" the
proscribed outcome. *Id.* at 1273. "Notice," the court held, "is provided by the
reasonable foreseeability of the natural and probable consequences of one's acts."
*Id.*

We do not believe it is useful to try to define the precise meaning of "specific
intent" in section 2340.[27] In light of the President's directive that the United States
not engage in torture, it would not be appropriate to rely on parsing the specific
intent element of the statute to approve as lawful conduct that might otherwise
amount to torture. Some observations, however, are appropriate. It is clear that the
specific intent element of section 2340 would be met if a defendant performed an
act and "consciously desire[d]" that act to inflict severe physical or mental pain or
suffering. 1 LaFave, *Substantive Criminal Law* § 5.2(a), at 341. Conversely, if an
individual acted in good faith, and only after reasonable investigation establishing

---

[27] In the August 2002 Memorandum, this Office concluded that the specific intent element of the
statute required that infliction of severe pain or suffering be the defendant's "precise objective" and that
it was not enough that the defendant act with knowledge that such pain "was reasonably likely to result
from his actions" (or even that that result "is certain to occur"). *Id.* at 3–4. We do not reiterate that test
here.

that his conduct would not inflict severe physical or mental pain or suffering, it appears unlikely that he would have the specific intent necessary to violate sections 2340–2340A. Such an individual could be said neither consciously to desire the proscribed result, *see, e.g.*, *Bailey*, 444 U.S. at 405, nor to have "knowledge or notice" that his act "would likely have resulted in" the proscribed outcome, *Neiswender*, 590 F.2d at 1273.

Two final points on the issue of specific intent: First, specific intent must be distinguished from motive. There is no exception under the statute permitting torture to be used for a "good reason." Thus, a defendant's motive (to protect national security, for example) is not relevant to the question whether he has acted with the requisite specific intent under the statute. *See Cheek v. United States*, 498 U.S. 192, 200–01 (1991). Second, specific intent to take a given action can be found even if the defendant will take the action only conditionally. *Cf., e.g., Holloway v. United States*, 526 U.S. 1, 11 (1999) ("[A] defendant may not negate a proscribed intent by requiring the victim to comply with a condition the defendant has no right to impose."). *See also id*. at 10–11 & nn. 9–12; Model Penal Code § 2.02(6). Thus, for example, the fact that a victim might have avoided being tortured by cooperating with the perpetrator would not make permissible actions otherwise constituting torture under the statute. Presumably that has frequently been the case with torture, but that fact does not make the practice of torture any less abhorrent or unlawful.[28]

DANIEL L. LEVIN
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[28] In the August 2002 Memorandum, this Office indicated that an element of the offense of torture was that the act in question actually result in the infliction of severe physical or mental pain or suffering. *See id.* at 3. That conclusion rested on a comparison of the statute with the CAT, which has a different definition of "torture" that requires the actual infliction of pain or suffering, and we do not believe that the statute requires that the defendant actually inflict (as opposed to act with the specific intent to inflict) severe physical or mental pain or suffering. *Compare* CAT art. 1(1) ("the term 'torture' means any act by which severe pain or suffering, whether physical or mental, *is intentionally inflicted*") (emphasis added) *with* 18 U.S.C. § 2340 ("'torture' means an act . . . *specifically intended to inflict* severe physical or mental pain or suffering") (emphasis added). It is unlikely that any such requirement would make any practical difference, however, since the statute also criminalizes attempts to commit torture. 18 U.S.C. § 2340A(a).