**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-4159**

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

MARCIO SANTOS-PORTILLO,

        Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington. Malcolm J. Howard, Senior District Judge. (7:18-cr-00010-H-1)

Argued: March 10, 2021                                     Decided: May 7, 2021

Before WILKINSON, AGEE, and FLOYD, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Agee joined. Judge Floyd wrote a dissenting opinion.

**ARGUED:** James Edward Todd, Jr., OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenville, North Carolina, for Appellant. Thomas Ernest Booth, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** G. Alan DuBois, Federal Public Defender, Eric Brignac, Chief Appellate Attorney, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant. Brian C. Rabbitt, Acting Assistant Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Robert J. Higdon, Jr., United States Attorney, Jennifer May-Parker, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

WILKINSON, Circuit Judge:

Appellant Santos-Portillo unlawfully entered the United States after a prior deportation resulting from a felony conviction. Federal officials arrested him with probable cause but without securing the administrative arrest warrant required by 8 U.S.C. § 1357(a). That arrest produced the evidence that led to Santos-Portillo's present conviction for illegal reentry into the United States under 8 U.S.C. § 1326(a).

On appeal, Santos-Portillo argues that we should suppress all post-arrest evidence against him. But § 1357(a) does not authorize courts to suppress evidence for violations of the provision. Santos-Portillo argues, however, that the federal courts have a broad supervisory power to suppress evidence for statutory violations by law enforcement regardless of whether Congress authorized suppression. But a proper respect for Congress's role in determining the consequences of statutory violations compels rejecting his argument. Even assuming we have the authority to create a suppression remedy where Congress has not provided one, we decline to exercise it in this case. We therefore affirm the judgment.

I.

In January 2018, Department of Homeland Security (DHS) Special Agent Thomas Swivel saw someone whom he thought he recognized from a prior case. This turned out to be Santos-Portillo. As Santos-Portillo drove away, Agent Swivel wrote down his license plate number.

Based on a subsequent records check, Agent Swivel learned that Santos-Portillo was a Honduran national who was in the United States illegally. He discovered a Texas felony

2

conviction for unlawfully fleeing from law enforcement and that Santos-Portillo had consequently been deported in 2011. Agent Swivel also found a photograph of Santos-Portillo in his immigration file.

Agent Swivel drove to the address to which the car was registered. He saw the car but no people. Concluding that Santos-Portillo was in the United States illegally, Agent Swivel began coordinating with other agents to make an arrest. A few days later, Agent Swivel and four other agents staked out Santos-Portillo's house. When Santos-Portillo exited the house, the agents confronted him. Santos-Portillo then gave his name and admitted he was from Honduras.

Agent Swivel then arrested Santos-Portillo and took him to a nearby ICE office. Santos-Portillo was fingerprinted; when Swivel sent the prints to several law enforcement agencies, they matched the profile of a previously deported alien. Agent Swivel then gave Santos-Portillo *Miranda* warnings and interrogated him. During questioning, Santos-Portillo admitted he was from Honduras, that he had previously been deported, and that he had not obtained permission to return to the United States.

Santos-Portillo was then criminally charged with violating 8 U.S.C. § 1326(a), which prohibits illegal reentry of previously removed aliens.

## II.

At Santos-Portillo's detention hearing in February 2018, Agent Swivel testified that he neither sought nor secured an administrative arrest warrant to detain Santos-Portillo. He was asked, "Do you ever get arrest warrants? Or is it generally the nature of the crime that you do these arrests without a warrant?" Swivel answered, "Generally, we encounter

3

people administratively. And, due to his prior deportation, there was an administrative arrest warrant in the A-File. . . . But–no." J.A. 36–37.

Subsequently, Santos-Portillo moved to suppress all post-arrest evidence. He based this motion on an alleged violation of 8 U.S.C. §1357(a), which permits warrantless arrests only if agents have probable cause and have a "reason to believe . . . there is [a] likelihood of the person escaping before a warrant can be obtained." Santos-Portillo argued that the agents had ample time to secure a warrant before arresting him. He asked the court to exercise its supervisory authority to suppress in order to prevent widespread disregard of a congressional command. J.A. 66.

The government countered by arguing that 8 U.S.C. § 1357(a) was not applicable to the arrest of Santos-Portillo. It argued that the involved agents had dual authority as customs agents to execute warrantless arrests based on probable cause alone. It also argued that the prior deportation order was an adequate substitute for an arrest warrant.

The magistrate judge issued a recommendation finding that 8 U.S.C. § 1357(a) did in fact apply to the arrest. *See United States v. Santos-Portillo*, No. 7-18-CR-10-1H, 2019 WL 3047427 (E.D.N.C. May 31, 2019). She thus concluded the arrest was unlawful because the agents had time to secure an arrest warrant but did not do so. *Id.* at 4–5. In the process, the magistrate judge rejected the government's arguments that the DHS agents had authority to arrest as customs officers and that an arrest warrant was not needed due to the prior deportation order. *Id.*[1] However, the magistrate judge recommended denying the

---

[1] The government does not challenge these determinations on appeal, and we therefore do not reach these questions.

4

motion to suppress because the arrest "was consistent with the Fourth Amendment" and because § 1357(a) did not authorize suppression as a remedy. *Id.* at 7. The district court subsequently adopted the magistrate judge's opinion and held that suppression was not warranted.

A trial followed where the post-arrest evidence was introduced against Santos-Portillo. He was convicted and issued a time-served sentence of 15 months. After conviction, Santos-Portillo was taken into custody by ICE agents and deported again.

Santos-Portillo filed a timely appeal.

## III.

### A.

Santos-Portillo argues that suppressing the evidence against him is necessary to give meaning to 8 U.S.C. § 1357(a)'s general requirement that immigration officials secure an administrative arrest warrant. But our analysis must begin with other statutes.

Congress has expressed its clear desire that aliens who commit felonies in the United States be deported. *See, e.g.*, 8 U.S.C. § 1227 (a)(2). Santos-Portillo is a felon, having been convicted in Texas for unlawfully using a vehicle to flee from the police. And moreover, Congress has expressed its intent that convicted felons who are deported, like Santos-Portillo, stay outside of the United States. 8 U.S.C. § 1326 makes it a federal crime for an alien who has been deported to reenter the United States without permission. Santos-Portillo admits he violated that statute, making him a criminal twice-over.

We thus confront a statutory scheme manifesting Congress's clear intent that individuals like Santos-Portillo be kept out of the United States. Santos-Portillo asks us to

5

apply 8 U.S.C. § 1357(a) in a way that frustrates that edict. That provision authorizes immigration officials "to make arrests" without a warrant for "any offense against the United States," but only "if the officer or employee is performing duties relating to the enforcement of the immigration laws at the time of the arrest and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest." Both parties agree that Agent Swivel arrested Santos-Portillo without a serious risk of him fleeing before a warrant could be obtained.

A legal requirement has thus been violated. But the question of what remedy is available to Santos-Portillo—or whether one exists at all for violations of this provision—remains. Absent unusual situations, the power to craft remedies for statutory violations lies with Congress, which after all enacted the statute, not the federal courts. *See, e.g.*, *Hernandez v. Mesa*, 140 S. Ct. 735, 742 (2020). There is absolutely no statutory basis for Santos-Portillo's argument that we should suppress the evidence against him. 8 U.S.C. § 1357(a) makes no mention of suppression or any other remedy for those arrested without an administrative warrant. This absence is notable, considering that Congress has authorized a suppression remedy in other contexts. *See, e.g.*, *United States* v. *Donovan*, 429 U.S. 413, 432 n.22 (1977) ("The availability of the suppression remedy for these statutory, as opposed to constitutional, violations . . . turns on the provisions of Title III rather than the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights.").

In the Fourth Amendment context, of course, the Supreme Court has required the suppression of incriminating evidence if law enforcement violates the Constitution. *See*

6

*Mapp v. Ohio*, 367 U.S. 643, 657 (1961). The exclusionary rule was deemed necessary to avoid the contamination of court proceedings with unconstitutionally gathered evidence. *See id.* at 659. But the parties agree there is no constitutional violation in this case. The Fourth Amendment permits "the warrantless arrest of an individual in a public place upon probable cause . . . ." *United States* v. *Santana*, 427 U.S. 38, 42 (1976). And the Court has specifically upheld a warrantless arrest with probable cause on the front steps of a house, *id.* at 40-41, just like what happened here. In this appeal, Santos-Portillo does not challenge that Agent Swivel had probable cause. Agent Swivel had accessed an immigration file containing an identifying photo and clear proof that Santos-Portillo was a convicted felon who had been deported, meaning he was almost certainly in the United States illegally. It is also worth noting that Agent Swivel did not invade Santos-Portillo's home to make the arrest.

Section 1357(a) thus adds a rule for immigration arrests not required by the Constitution. In fact, the statute's warrant requirement does not even correspond that well to Fourth Amendment concerns. In contexts where the Fourth Amendment does require a warrant, warrant applications must be considered by a "neutral and detached magistrate" and not "a policeman or Government enforcement agent." *Johnson v. United States*, 333 U.S. 10, 14 (1948). That neutral judicial officer determines whether probable cause exists, free of any loyalty to law enforcement. Under § 1357(a), in contrast, an *administrative* official within the Executive Branch issues the arrest warrant. Although this may offer individuals some protection, it is substantially different from that guaranteed by the Fourth

Amendment's warrant requirement. And it offers yet further evidence that *judicial* suppression was decidedly not what Congress had in mind.

In sum, Congress has provided no suppression remedy for § 1357(a) infractions. The Constitution does not provide a remedy because there has been no constitutional violation. It would seem therefore that Santos-Portillo's appeal is at an end.

B.

But no. Pointing to no positive-law authority for suppression, Santos-Portillo nevertheless appeals to the judiciary's alleged inherent power to devise remedies for violations of the law by the government. His primary authority for this asserted judicial supervisory power is *McNabb v. United States*, 318 U.S. 332 (1943). There, the Supreme Court excluded confessions from bootleggers who had been arrested, confined without counsel, and questioned for two days, all in violation of a federal statute requiring prompt delivery of arrestees to a judicial officer. The Court reasoned that it had the power and responsibility to ensure "civilized standards of procedure and evidence" in the federal courts, and that the "principles governing the admissibility of evidence in federal criminal trials have not been restricted, therefore, to those derived solely from the Constitution." *Id.* at 340-41.

As Santos-Portillo points out, *McNabb* did not identify a positive-law source of authority for its decision. *McNabb* is not unique from that period of the Supreme Court's history, in which "the Court assumed it to be a proper judicial function to 'provide such remedies as are necessary to make effective' a statute's purpose." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) (quoting *J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964)). For

8

example, the Court repeatedly implied private causes of action for violations of federal statutes that did not, by their terms, grant private parties permission to sue. *See, e.g.*, *Borak*, 377 U.S. at 433.

But the winds have changed. Gone are the "heady days in which [the courts] assumed common-law powers to create causes of action" and other remedies. *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 75 (2001) (Scalia, J., concurring). The Court has come to recognize that the creation of remedies for violations of federal statutes is generally a legislative power, not a judicial one. *Hernandez*, 140 S. Ct. at 742 ("[A] federal court's authority to recognize damages remedies must rest at bottom on a statute enacted by Congress."). In the process, it has disavowed earlier cases from the period in which *McNabb* was decided, pointedly referring to those cases as being a part of the "*ancien regime*." *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001). Thus, the once freewheeling power of the federal courts to create remedies where Congress did not has met only disfavor from the Court itself.

It is therefore unsurprising that the Supreme Court refused to extend *McNabb* in the one modern case in which it considered the question. In *Sanchez-Llamas v. Oregon*, 548 U.S. 331 (2006), officials arrested and interrogated a foreign national without informing him, as required under the Vienna Convention, that he could ask for the Mexican Consulate to be notified of his detention. *Id.* at 339-40. The Court cited the "high cost" of the exclusionary rule and noted it had historically "applied the exclusionary rule primarily to deter *constitutional* violations." *Id.* at 348 (emphasis added). The Court went on to explain that in the "few cases in which [it had] suppressed evidence for statutory violations," the

9

"excluded evidence arose directly out of statutory violations that implicated important Fourth and Fifth Amendment interests." *Id.* at 348. Because the provision of the Vienna Convention requiring consular notification was only "remotely connected to the gathering of evidence," the Court declined to suppress the evidence. *Id.* at 349.

Sanchez-Llamas makes clear that the range of cases where courts can on their own suppress evidence for a statutory violation is quite limited. In a recent case limiting the scope of the suppression remedy for *constitutional* violations, the Court has expressed concerns about the "costs" of the exclusionary rule and stated that "exclusion has always been our last resort, not our first impulse." *Herring v. United States*, 555 U.S. 135, 141 (2009). (internal quotation marks and quotation omitted). In a subsequent case again limiting the exclusionary rule, the Court explained that "[e]xclusion exacts a heavy toll on both the judicial system and society at large" because it "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence." *Davis. v. United States*, 564 U.S. 229, 237 (2011).

Our sister circuits have had no difficulty discerning the Supreme Court's direction. Several have declined to suppress evidence obtained in violation of § 1357(a). As the First Circuit explained, "a statutory violation untethered to the abridgment of constitutional rights is insufficient to justify suppression." *United States* v. *De La Cruz*, 835 F.3d 1, 6 (1st Cir. 2016) (internal quotation marks and citation omitted). Or as the Sixth Circuit held: "Although exclusion is the proper remedy for some violations of the Fourth Amendment, there is no exclusionary rule generally applicable to statutory violations." *United States* v.

*Abdi*, 463 F.3d 547, 556 (6th Cir. 2006). We find these authorities persuasive and decline to create a circuit split.

Our friend in dissent sees things differently, arguing that we should create a new rule of evidence as a matter of our "supervisory authority." But the cases relied upon by the dissent establish only the unremarkable proposition that courts have traditionally had the power to regulate proceedings inside the courtroom. *See Young v. United States ex rel. Vuitton Et Fils S.A.*, 481 U.S. 787, 808 (1987) (contempt); *Ristaino v. Ross*, 424 U.S. 589, 597 n.9 (1976) (*voir dire*). The dissent proposes a regime to regulate behavior outside the courtroom by creating rules of evidence at odds with congressional intent. This is a remarkable assertion of power, one that fails to set forth any discernible limit that would prevent the power from being put to boundless use. "[T]here is a danger of overreaching when one branch of the Government, without benefit of cooperation or correction from the others, undertakes to define its own authority." *Degan v. United States*, 517 U.S. 820, 823 (1996). In that spirit, we see a stark difference between the judiciary's traditional power to regulate a courtroom proceeding and the dissent's proposed power to refashion Congress's remedial schemes. Moreover, Congress has established a procedure for creating evidentiary rules; claiming that courts can create their own "suggest[s] that those who struggled so long and hard for the Rules Enabling Act of 1934 were wasting their time because the Court could have proceeded without congressional authorization . . ." Stephen B. Burbank, *Procedure, Politics, and Power: The Role of Congress*, 79 Notre Dame L. Rev. 1677, 1688 (2004). Even more to the point: Congress chose not to prescribe

suppression for violations of § 1357(a). Suppressing evidence contrary to that choice cannot be a proper use of the judiciary's inherent powers.

C.

Santos-Portillo alleges, however, that courts can suppress evidence in cases of "egregious" or "flagrant" law enforcement behavior. This standard is vague and open-ended. It invites litigiousness. And it fails on its own terms. This case features a perfectly lawful arrest. Agent Swivel did not break into Santos-Portillo's home. He had airtight probable cause to proceed. Mitigating the chance of mistaken identity, Agent Swivel did the background work. He confirmed appellant's previous conviction, his prior deportation, and his subsequent reentry. He got Santos-Portillo to confirm his identity and country of origin before arresting him. And while appellant contends that the violation of § 1357(a) here implicates important Fourth Amendment interests, "the likelihood of the person escaping" does not affect that Amendment's core requirement of probable cause.

Santos-Portillo also alleges on appeal that there is widespread disregard of § 1357(a)'s arrest warrant requirement by immigration officials. But Santos-Portillo only raised this issue in a cursory fashion before the magistrate judge and district court. He did not present or solicit evidence on this issue at the hearing before the magistrate judge. He relies instead upon snippets of testimony from Agent Swivel and another agent brought out in cross-examination. Even assuming that an agent does not secure an administrative arrest warrant, that does not mean all or even most of those arrests were unlawful. Santos-Portillo did not ask about and does not present evidence on other individual cases in which the statute was allegedly violated. This alone is fatal because the statute does not require an

arrest warrant if there is a likelihood of flight. In many of those cases, the agents may have had reason to fear the arrestee would flee. In short, there is before us no evidentiary foundation for appellant's "widespread disregard" claim.

Finally, Santos-Portillo urges us to suppress to maintain the integrity of § 1357(a). How, he asks, can this provision mean anything if there are no consequences when it is violated? First of all, we are not convinced that meaninglessness is the sole alternative to a judicial suppression remedy. The United States is a nation of laws, and we are not prepared to summarily dismiss the prospect that government officials will generally take statutory commands seriously, whatever the remedial scheme. Internal disciplinary proceedings often take cognizance of any expression on Congress's part. *See* Ronald J. Allen et. al., Criminal Procedure Investigation and Right to Counsel 344-45 (3d ed. 2016) (arguing that pressure from the public and elected officials will encourage good behavior by law enforcement). If DHS agents routinely violate rules, they risk consequences, including the potential loss of employment.

But more fundamentally, Congress has the power to pass laws without creating specific legal consequences that flow from their violation. Congress is not prohibited by Article III from passing advisory resolutions and standards. Such hortatory laws encourage admirable behavior rather than mandate it by the threat of punishment. *See* Jacob E. Gersen & Eric A. Posner, *Soft Law: Lessons From Congressional Practice*, 61 Stan. L. Rev. 573, 584-85 (2008). Hortatory laws have an ancient lineage. Laws encouraging good behavior without threat of punishment existed in ancient Greece. *See, e.g.*, Plato, Laws 151 (Benjamin Jowett trans. 2013) (endorsing the use of hortatory "prefaces" in laws so that

13

the citizens will be "as readily persuadable to virtue as possible"). Today, such laws are ubiquitous in the federal statute books. *See, e.g.*, *Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163, 173 (2009) (giving several examples of "conciliatory or precatory" statutory provisions that do not create "substantive rights"). For example, 4 U.S.C. § 8 provides that "[n]o disrespect should be shown to the flag of the United States," and that the flag "should not be dipped to any person or thing." Further, "[a]ll private citizens . . . are encouraged to recognize Parents' Day." 36 U.S.C. § 135(b). Many ethical rules for lawyers are hortatory, and yet there is fortunately evidence that they are complied with in spite of there being no clear consequences for breaking them. *See* Fred C. Zacharias, *Steroids and Legal Ethics Codes: Are Lawyers Rational Actors*, 85 Notre Dame L. Rev. 671, 703 (2010) (arguing that "hortatory or generalized rules may sometimes make sense as a means for developing a culture of introspection and generally moral behavior").

What are we to make of this? We can draw from the long tradition and ubiquity of hortatory laws at least the modest lesson that Congress is not required to deploy in any statutory scheme the full panoply of remedies at its disposal. So it is here. Congress's undeniable power to repeal 8 U.S.C. § 1357(a) altogether implies its concomitant power to make it more in the nature of a hortatory enactment. Or to put it another way, the fact that Congress has decided not to incur the formidable costs of a judicial exclusionary remedy does not make the passage of § 1357(a) any less legitimate or any less worthwhile.

IV.

Manufacturing a remedy in the course of creating a circuit split would be a dramatic step. Whether we think a congressional remedial scheme is optimal cannot in the end be dispositive. We are not lawmakers and must resist the temptation to behave as such. Because the judiciary has "sworn off the habit of venturing beyond Congress's intent," *Sandoval*, 532 U.S. at 287, we cannot accept the invitation to refashion the handiwork of Congress in this case.

The judgment of the district court is accordingly affirmed.

*AFFIRMED*

FLOYD, Circuit Judge, dissenting:

I agree with the majority that 8 U.S.C. § 1357 does not create an exclusionary remedy by statute and that the arresting agents did not violate the Constitution. My disagreement with the majority is rooted in a difference in opinion over the locus of federal courts' exclusionary authority. Because I believe the majority too narrowly views federal courts' inherent authority to supervise the proceedings before them, I respectfully dissent.

*     *     *

The majority asserts that the supervisory authority relied on in *McNabb v. United States*, 318 U.S. 332 (1943), has lost its vitality, and has been cabined such that—practically speaking—suppression is warranted only when (1) there is a constitutional violation, or (2) it is explicitly provided for by statute. And because § 1357 evinces no intent on the part of Congress to create an exclusionary rule, the majority argues that we usurp Congress's role by creating one. In reaching this conclusion, the majority situates the exclusionary rule among other judicially crafted remedies—in particular, implied causes of action—that have fallen into disfavor.

Under this reading of post-*McNabb* precedent, the case is a relic of a bygone era in which federal courts often crafted remedies in the face of congressional silence. But judicially implying a cause of action into a statute—thereby creating rights and imposing external liabilities where none previously existed—is a different exercise of judicial authority than imposing evidentiary sanctions. Previously, federal courts purported to create implied causes of action either as an exercise of statutory interpretation as to a

16

statute's remedial purpose or as an exercise of federal common law. *See, e.g.*, *J. I. Case Co. v. Borak*, 377 U.S. 426, 431–32 (1964); *Tex. & Pac. Ry. Co. v. Rigsby*, 241 U.S. 33, 39 (1916). The Supreme Court's modern rejection of that doctrine emphasizes that federal courts lack common-law powers, so the judicial branch cannot simply graft causes of action onto substantive statutory law. *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001). Of course, it is for Congress to create substantive law along with causes of action to enforce that law. And I share the majority's concern that federal courts should resist the impulse to improve upon a statute or undercut its objectives.

But the authority of federal courts to order evidentiary suppression for statutory violations does not turn on whether we can imply such a remedy into the statute—either as an act of statutory interpretation or of federal common-law. The Supreme Court in *McNabb* considered the violation by federal officials of the presentment statute. In deciding that the violation in that case merited suppression, the Court declined to address whether the officers' actions independently violated the Constitution. *McNabb*, 318 U.S. at 340. Nor did the Court consider whether the statute somehow implied an exclusionary remedy. Rather, the Court located its power in the "supervisory authority over the administration of criminal justice in the federal courts," *id.* at 341, which tasks courts with "establishing and maintaining civilized standards of procedure and evidence," *id.* at 340.

Thus, supervisory authority is a power inherent to federal courts over the proceedings before them. Our exercise of that authority does not invade the province of the legislature in the same way as other judicially created remedies because it does not seek to supplement or improve upon a statutory scheme, nor does its scope turn on a statute's

17

purpose.  Instead, supervisory authority seeks to govern the integrity of "the enforcement of the federal criminal law in the federal courts."  *Id.* at 341.  Viewed as an exercise of supervisory authority, suppression is merely an evidentiary remedy to deter government reliance on illegally obtained evidence at trial.  *See, e.g.*, *United States v. Payner*, 447 U.S. 727, 734 (1980) (describing the rule as an "exclusionary sanction"); *Herring v. United States*, 555 U.S. 135, 141 (2009) ("[T]he exclusionary rule is not an individual right . . . .").

Accordingly, the question presented by this case is how far federal courts should extend their supervisory authority over federal proceedings.  For the reasons set forth above, I do not share the majority's view of *Sanchez-Llamas v. Oregon*, 548 U.S. 331 (2006), as the natural culmination of a broader turn away from supervisory authority.  In the years following *McNabb*—and contemporary to the Supreme Court's rejection of implied causes of action—the Court continued to affirm its supervisory authority in a variety of contexts.  *See, e.g.*, *Young v. United States ex rel. Vuitton Et Fils S.A.*, 481 U.S. 787, 808 (1987) ("The use of this Court's supervisory authority has played a prominent role in ensuring that contempt proceedings are conducted in a manner consistent with basic notions of fairness."); *Ristaino v. Ross*, 424 U.S. 589, 597 n.9 (1976) (holding that voir dire concerning racial prejudice can be required as an exercise of supervisory authority); *Bank of N.S. v. United States*, 487 U.S. 250, 264 (1988) (Scalia, J., concurring) ("I agree that every United States court has an inherent supervisory authority over the proceedings conducted before it.").

"A federal court 'may, within limits, formulate procedural rules *not specifically required by the Constitution or the Congress*.'"  *Bank of N.S.*, 487 U.S. at 254 (emphasis

18

added) (quoting *United States v. Hasting*, 461 U.S. 499, 505 (1983)). A core purpose of supervisory authority is "to deter illegal conduct." *Hasting*, 461 U.S. at 505. And one way of doing so is the exclusionary rule—although it should be applied with caution. *See Payner*, 447 U.S. at 734. As the majority notes, the Supreme Court has narrowed the applicability of the exclusionary rule since *McNabb*, and it is not automatically applied to any violation, constitutional or otherwise. *See, e.g.*, *Herring*, 555 U.S. at 141; *United States v. Caceres*, 440 U.S. 741, 755–56 (1979). Instead, we ask whether suppression as an exercise of supervisory authority "serves the 'twofold' purpose of deterring illegality and protecting judicial integrity." *Payner*, 447 U.S. at 735 n.8. And courts must always ask whether exclusion's deterrent benefits outweigh its social costs. *Herring*, 555 U.S. at 141.

*Sanchez-Llamas* did not displace this balancing test. In that case, the Court held that supervisory authority did not apply because the Court was reviewing state court proceedings. 548 U.S. at 345–46. True, the Court observed that the exclusionary rule has previously been applied to statutes that implicate constitutional interests. But it did so in declining to *imply* that remedy into an international treaty. *Id.* at 347–48. The Court did not thereby limit its understanding of its supervisory authority.

The Court's language in *Sanchez-Llamas* creates a closer call as to whether a standalone violation of § 1357(a) justifies suppression. Indeed, the Supreme Court has declined in the past to craft a sweeping exclusionary remedy for violations of executive regulations. *See Caceres*, 440 U.S. at 755–56. But the ultimate question is always the balance of suppression's benefits and harms. I would hold that systemic or repeated violations of § 1357(a) could tip the balance in favor of the suppression remedy in a given

19

case. The questions of deterrence and culpability loom large in the Supreme Court's suppression jurisprudence. *See, e.g.*, *Herring*, 555 U.S. at 144. The Court has suggested "recurring or systemic negligence" could trigger exclusion. *Id.* Similarly, we have suggested that we would consider exclusion as an exercise of supervisory authority for "severe official misconduct," *United States v. Neiswender*, 590 F.2d 1269, 1272 (4th Cir. 1979), or "widespread or repeated [statutory] violations," *United States v. Walden*, 490 F.2d 372, 377 (1974); *see also United States v. Johnson*, 410 F.3d 137, 149 (4th Cir. 2005); *United States v. Sanders*, 104 F. App'x 916, 921 (4th Cir. 2004) (per curiam).

Santos-Portillo presented compelling evidence of repeated violations in the face of a plain statutory requirement. Indeed, the record reveals that at least one agent admitted to routinely failing to secure arrest warrants, that five agents participated in this warrantless arrest, and that this conduct was blessed by ICE counsel. And in a separate case in the Eastern District of North Carolina, a similar, 2017 warrantless arrest was found to have violated § 1357(a). *United States v. Segura-Gomez*, No. 4:17-CR-65-FL-1, U.S. Dist. LEXIS 203189, at *1–8 (E.D.N.C. Nov. 30, 2018) (adopting the magistrate judge's report and recommendation that the arrest violated § 1357(a)).[1] Further, the evidence suggests that one of the arresting agent's primary motivations was to collect evidence for criminal prosecution, not merely to enforce civil immigration laws. These are the sort of facts that might justify the use of supervisory authority to prevent the criminal process from

---

[1] For this reason, this case also differs from the standalone violations considered by the First and Sixth Circuits. *See United States v. De La Cruz*, 835 F.3d 1, 5–9 (1st Cir. 2016); *United States v. Abdi*, 463 F.3d 547, 555–57 (6th Cir. 2006).

implicitly endorsing repeated violations of § 1357 to obtain evidence.[2]

Nor does this case present the same social costs typically at issue in the suppression context. There is no risk that suppression would "set the criminal loose in the community." *Davis v. United States*, 564 U.S. 229, 237 (2011). Whatever the outcome of Santos-Portillo's criminal trial, he still faced removal. Thus, I respectfully disagree with the majority's contention that suppression in a federal criminal trial would undercut Congress's broader, civil immigration objectives. Although I do not decide how the district court should have balanced the scales in this case, Santos-Portillo mustered enough evidence that the district court should have contended with his argument as to the need to deter widespread or repeated violations of § 1357(a). *See James v. Jacobson*, 6 F.3d 233, 239 (4th Cir. 1993) (noting that a failure to exercise discretion is itself an abuse of discretion).

For the foregoing reasons, I respectfully dissent.

---

[2] I note also that this was a remarkably easy procedural safeguard for the arresting agent to comply with. The minimal burden imposed by the statute and its disregard with no suggestion of an exigency also weighs in favor of suppression.